Jon M. Sands
Federal Public Defender
District of Arizona
Sara Chimene-Weiss (MA BAR No. 691394)
Timothy M. Gabrielsen (IL Bar No. 6187040)
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
sara_chimene-weiss@fd.org
tim_gabrielsen@fd.org
602.382.2816 Telephone
602.889.3960 Facsimile

*Counsel for Petitioner*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Charles Michael Hedlund, | No. |
| Petitioner, | |
| vs. | DEATH-PENALTY CASE |
| David Shinn, Director, Arizona Department of Corrections; Jeffrey Van Winkle, Warden, Arizona State Prison – Florence Complex; and Stephen Morris, Warden, Arizona State Prison – Eyman Complex, | |
| Respondents. | |

## PETITION FOR WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. § 2254

# Table of Contents

I.    INTRODUCTION ................................................................. 3

II.   FACTS AND PROCEDURAL HISTORY ................................. 4

   A.  Hedlund's Personal History ............................................ 4

      1. Early horrors ............................................................ 5

      2. Young adulthood .................................................... 14

   B.  The Crime ..................................................................... 17

   C.  Procedural History ........................................................ 19

      1. Pretrial Proceedings ............................................... 219

      2. Trial: Guilt Phase .................................................. 21

      3. Trial: Sentencing Phase ......................................... 22

      4. Appellate Proceedings ........................................... 26

      5. Federal Habeas Proceedings ................................... 28

      6. New Independent Review ....................................... 30

III.  STATE COURT PRESUMPTION OF CORRECTNESS .............. 31

IV.   PROCEDURAL STATUS OF CLAIMS AND EXHAUSTION ........ 32

V.    RIGHT TO AMEND ......................................................... 33

VI.   AEDPA IS UNCONSTITUTIONAL ...................................... 33

   A.  AEDPA unconstitutionally suspends the writ of habeas corpus. ................ 34

   B.  AEDPA violates the separation-of-powers doctrine. ............................. 35

   C.  Conclusion .................................................................... 36

CLAIM ONE ........................................................................ 36

Hedlund's constitutional rights were violated by the Arizona Supreme Court when it purported to cure the constitutional violation in Hedlund's case by conducting an independent review, instead of allowing a sentencing hearing before a jury. ......................... 36

A.  Procedural posture ........................................................ 37

B.  Hedlund is entitled to have a jury determine his sentence. .................... 37

   1. Hedlund's conviction is not final. .......................... 37

   2. Hedlund is constitutionally entitled to a jury determination of the facts necessary to support a death sentence under *Ring* and *Hurst* ................. 42

C. The causal nexus error identified by the federal court could only be corrected by a new hearing, where a sentencer could review evidence and evaluate its weight firsthand. ........................................................ 46

D. The Arizona Supreme Court's determination that an independent review was the appropriate remedy was contrary to, and an unreasonable application of, clearly established federal law.............................................. 50

E. Conclusion ................................................................................ 51

CLAIM TWO.................................................................................... 52

The Arizona Supreme Court unconstitutionally barred mitigation evidence from being given effect where it did not have a causal connection to Hedlund's crime................................................................................................ 52

A. Procedural posture ...................................................................... 52

B. The Arizona Supreme Court imposed an unconstitutional causal nexus requirement. ............................................................................... 53

   1. Causal nexus requirements are unconditional............................. 53

   2. A causal nexus test was imposed here. .................................... 55

C. Hedlund was prejudiced. .............................................................. 59

D. The Arizona Supreme Court's decision was an unreasonable application of clearly established federal law, and involved an unreasonable determination of the facts. ........................................................... 61

E. Conclusion ................................................................................ 64

CLAIM THREE ................................................................................. 64

The Arizona Supreme Court unconstitutionally refused to consider Hedlund's relevant mitigation evidence developed since his 1993 sentencing hearing. .... 64

A. Procedural posture ...................................................................... 65

B. The Arizona Supreme Court unconstitutionally refused to consider Hedlund's mitigation evidence introduced since his first independent review................................................................................... 65

C. This exclusion of mitigation evidence prejudiced Hedlund......................... 68

D. Conclusion ................................................................................ 70

CLAIM FOUR .................................................................................. 70

The Arizona Supreme Court's decision that Hedlund warrants the death penalty and imposing death on Hedlund violates the Eighth and Fourteenth

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Amendments, as Hedlund is not among the worst of the worst offenders warranting death. ................................................................................ 70

A. Procedural Posture .......................................................................... 70

B. Hedlund is not among the worst of the worst people convicted of first-degree homicide. ............................................................................... 71

  1. Hedlund's sole aggravator is not especially weighty. ............................ 72

  2. Hedlund's extensive mitigation outweighs the slight weight of the sole aggravating factor. .................................................................. 79

C. Conclusion .................................................................................... 81

CLAIM FIVE .......................................................................................... 82

The Arizona Supreme Court unconstitutionally required that a death sentence was warranted unless Hedlund could prove his mitigating circumstances by a preponderance of the evidence, and could prove that they outweighed the aggravator. ............................................................................................ 82

A. The Arizona Supreme Court unconstitutionally required that Hedlund prove mitigation by a preponderance of the evidence. ................................ 83

B. The Arizona Supreme Court unconstitutionally required Hedlund to affirmatively prove that it should spare his life. ...................................... 84

C. Conclusion .................................................................................... 85

CLAIM SIX ............................................................................................ 86

Executing Hedlund more than 26 years after he was sentenced to death violates the Eighth and Fourteenth Amendments. ...................................... 86

CLAIM SEVEN ....................................................................................... 90

Hedlund's death sentence must be vacated because of the cumulative prejudicial effect of all of the errors committed by the Arizona Supreme Court. .................................................................................................. 90

PRAYER FOR RELIEF ............................................................................ 936

CERTIFICATE OF SERVICE .................................................................... 365

1    Petitioner Charles Michael Hedlund ("Hedlund"), through counsel, petitions
2 the Court pursuant to 28 U.S.C. § 2254 to issue a writ of habeas corpus. Hedlund is
3 currently in the custody of Respondents, who are detaining him pursuant to
4 judgments and sentences of the Arizona state courts. Hedlund's sentence was
5 obtained in violation of his rights under the Constitution, laws, and treaties of the
6 United States. He requests that this Court grant a writ of habeas corpus and any
7 other appropriate relief from his unconstitutional conviction and sentence.

8    In the Claims set forth below, Hedlund seeks *vacatur* of the death sentence
9 imposed by the Arizona Supreme Court in its independent review of December 10,
10 2018, in which it considered mitigating circumstances presented before a judge at
11 capital sentencing from July 23 through 28, 1993, and weighed them against the
12 sole remaining aggravating factor in this case. *See State v. Hedlund*, 431 P.3d 181
13 (Ariz. 2018), *pet. for cert. filed* (U.S. July 18, 2019) (No. 19-5247).

14    In 2017, the United States Court of Appeals for the Ninth Circuit granted a
15 conditional writ of habeas corpus as to Hedlund's 1993 death sentence based on
16 what has come to be called "causal nexus" error: the state sentencing court and,
17 later, the state supreme court on direct appeal, failed to properly consider mitigating
18 evidence that lacked a causal connection to the crime, in violation of *Eddings v.*
19 *Oklahoma*, 455 U.S. 104 (1982). *See Hedlund v. Ryan*, 854 F.3d 557, 583–88 (9th
20 Cir. 2017). The Ninth Circuit found this error had a substantial and injurious effect
21 on Hedlund's sentence. *Id.* The State of Arizona filed a motion for an independent
22 review in the Arizona Supreme Court, to correct the identified constitutional error,
23 (DA Doc. 15[1]) which Hedlund opposed (DA Doc. 21). The Arizona Supreme Court
24 granted the State's motion (DA Doc. 23) and imposed a death sentence on Hedlund
25 through a new proceeding, which it purported remedied the constitutional error.

26
27 [1] Hedlund's direct appeal docket in the Arizona Supreme Court, CR-93-0377-AP, includes both his 1993 direct appeal proceedings and the 2018 proceedings. It will
28 be referred to as "DA Doc." and will use the most recent docket provided by the Arizona Supreme Court.

## THIS MATTER SHOULD BE STAYED PENDING RESOLUTION OF *MCKINNEY V. ARIZONA*

The United States Supreme Court granted certiorari on June 10, 2019, in co-defendant James McKinney's appeal, *McKinney v. Arizona*, No. 18-1109. Hedlund respectfully requests that this Court hold this Petition in abeyance pending resolution of *McKinney*.

The questions before the Supreme Court in *McKinney* include the propriety of the Arizona Supreme Court conducting a new independent review of old aggravating and mitigating evidence, rather than ordering a new capital sentencing hearing and requiring other procedures that would meet contemporary requirements of the United States Constitution, rather than the understanding in place when the Arizona Supreme Court's initial direct review in this matter occurred, some of which has been explicitly overruled. *See State v. McKinney & Hedlund*, 917 P.2d 1214, 1225–32 (Ariz. 1996). This includes sentencing by a jury. *See Ring v. Arizona*, 536 U.S. 584 (2002); *Hurst v. Florida*, 136 S. Ct. 616 (2016). The Supreme Court has scheduled oral argument in *McKinney* for December 11, 2019.

Hedlund's petition for writ of certiorari, which presents the same issues as the petition for which certiorari was granted in *McKinney*, remains pending in the Supreme Court in *Hedlund v. Arizona*, No. 19-5247. In his petition, Hedlund has asked the Supreme Court to hold his petition pending resolution of *McKinney*. The State of Arizona has agreed with this request. (Resp't's Br. in Opp'n to Pet. for Cert. at 1, *Hedlund v. Arizona* (No. 19-5347).)

Hedlund respectfully requests that this Court hold this Petition in abeyance pending resolution of *McKinney* and pending resolution of his own case in the United States Supreme Court. Because the Arizona Supreme Court issued the judgment challenged herein on December 10, 2018, Hedlund files this Petition now in order to preserve his rights. *See* 28 U.S.C. § 2244(d)(1). Hedlund requests and reserves the right to amend this Petition pending the outcome of *McKinney*.

## I.   INTRODUCTION

This Petition is second-in-time, but it is not a second or successive petition for relief that must meet the requirements of 28 U.S.C. § 2244(b) and requires the Ninth Circuit's authorization for filing. "Second or successive" is a term of art, and "it is well settled that the phrase does not simply 'refe[r] to all § 2254 applications filed second or successively in time." *Magwood v. Patterson*, 561 U.S. 320, 331–32 (2010) (quoting *Panetti v. Quarterman*, 551 U.S. 930, 944 (2007)). *Panetti* held that there is an "exceptio[n]" to § 2244(b) for a second application raising a claim that would have been unripe had the petitioner presented it in his first application." *Magwood*, 561 U.S. at 332. This is the case here.

An event occurred in the litigation history of Hedlund's own case, to wit, the Arizona Supreme Court's imposition of Hedlund's death sentence on independent review on December 10, 2018, following the federal court's conditional grant of the habeas corpus writ, that renders the present Petition an original habeas corpus petition subject to the statute of limitations of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2244(d)(1), and AEDPA's other requirements. This allows this Court's consideration of the merits of Hedlund's constitutional claims. *See Shannon v. Newland*, 410 F.3d 1083, 1088–89 (9th Cir. 2010) (citing *Johnson v. United States*, 544 U.S. 295 (2005)).

The claims presented herein were unripe for adjudication in Hedlund's initial § 2254 proceedings in this Court, in *Hedlund v. Ryan*, No. 2:02-cv-00110-PHX-DGC. None of the claims below have been presented in a prior petition for writ of habeas corpus, or could have been presented, because they arise out of the Arizona Supreme Court's 2018 judgment in *State v. Hedlund*, 431 P.3d 181 (Ariz. 2018).

"[C]laims that do not survive a literal reading of AEDPA's gatekeeping requirements may nonetheless be addressed on the merits." *United States v. Lopez*, 577 F.3d 1053, 1064 (9th Cir. 2009). The Ninth Circuit has ruled that the considerations in *Panetti* should guide this determination. These considerations are

3

"(1) the implications for habeas practice of reading 'second or successive' literally for such claims, (2) whether barring such claims would advance the policies behind AEDPA's passage and (3) the Court's pre-and post-AEDPA habeas jurisprudence, including the common law abuse-of-the-writ doctrine." *Id*. at 1056.

The purposes of § 2244 are served and it is not an abuse of the writ where a petitioner is permitted to file a successive petition when its claims were not ripe for adjudication during the pendency of first habeas proceedings. *United States v. Buenrostro*, 638 F.3d 720, 725 (9th Cir. 2011) (citing cases); *see also Hill v. Alaska*, 297 F.3d 895, 898 (9th Cir. 2002) (declining to find petition successive "if the prisoner did not have an opportunity to challenge the state's conduct in a prior petition"); *Walker v. Roth*, 133 F.3d 454, 455 (7th Cir. 1997) (per curiam) ("None of these new claims were raised in his first petition, nor could they have been; [the petitioner] is attempting to challenge the constitutionality of a proceeding which obviously occurred after he filed, and obtained relief, in his first habeas petition.").

Because these claims could not have been included in Hedlund's first petition, he "is not obliged to secure [the Ninth Circuit's] permission prior to filing his habeas petition in the district court." *Hill*, 297 F.3d at 899. This petition is properly filed pursuant to § 2254 under *Magwood*, 561 U.S. 320, and this court should consider its merits, because its claims have arisen in a new state Court judgment intervening between habeas applications—the Arizona Supreme Court's 2018 decision on independent review that Hedlund warranted the death penalty, after the federal court conditionally granted the writ of habeas corpus. *See Hedlund*, 431 P.3d 181.

## II.   FACTS AND PROCEDURAL HISTORY

### A.   Hedlund's Personal History

Charles Michael Hedlund was born November 22, 1964, to Bobbi Morris and Charles Hedlund. (ROA 8; ROA 259 at 12.[2]) Hedlund's parents never married, and

---

[2] Trial proceedings for the Maricopa County Superior Court are docketed under CR

Hedlund never knew his father. (ROA 259 at 12.) Prior to her affair with Hedlund's father and resulting pregnancy with Hedlund, Bobbi had been engaged to James McKinney Sr.[3] They had an on-again, off-again, unstable relationship, and reunited while she was pregnant. (Tr. 7/26/1993 at 75.) McKinney refused to marry Bobbi until after she gave birth to Hedlund, and he resented and mistreated Hedlund throughout his life. (Tr. 7/26/1993 at 75; Tr. 7/28/1993 at 9, 14.) Hedlund believed that his stepfather, McKinney Sr., was his actual father and was not told the truth until he was around twelve. (ROA 259 at 12.) Bobbi and McKinney Sr. had three children: Donna, Diana, and James McKinney (Hedlund's co-defendant). Bobbi later had another son, Chris Morris, by another man. (Tr. 10/29/1992 at 45–46.)

### 1.    Early horrors

As the Arizona Supreme Court dissent noted, Hedlund's childhood was "nothing short of horrific." *State v. Hedlund*, 431 P.3d 181, 191 (Ariz. 2018) (Vasquez, J., dissenting). "Words fail to adequately describe the horrors that Hedlund suffered as a child." *Hedlund v. Ryan*, 750 F.3d 793, 826 (9th Cir. 2014)

---

91-90926. Reporter's transcripts are designated "Tr." followed by the relevant date and page number. Indexed documents from the trial record on appeal are designated "ROA" followed by the docket number, and the separately indexed minute entries are designated "ROA ME." Exhibits from the trial are designated "Trial Ex." and from the presentence hearing, now called the penalty phase, are designated "Present. Hr'g Ex." followed by the exhibit number. Because there was no docket for the petition for post-conviction relief ("PCR") documents, they are referred to by the appropriate pleading name and the date filed, and include the designation "PCR" where appropriate. There was no post-conviction evidentiary hearing in this case. Docket number CR-93-0377-AP identifies Hedlund's direct appeal to the Arizona Supreme Court, and includes the recent new independent review, and will be referred to as "DA Doc." and will use the most recent docket provided by the court. The Arizona Supreme Court docket for Hedlund's petition for review from the Maricopa County Superior Court's denial of his petition for post-conviction relief is docket number CR-01-0264-PC, and will be referred to as "PFR Doc."

[3] There are two people named "James McKinney" who are discussed throughout this Petition. Reference to Hedlund's step-father will be to "James McKinney Sr." or "McKinney Sr." Hedlund's co-defendant will be referred to as "James McKinney" or "McKinney."

(Wardlaw, J., dissenting), *opinion withdrawn and superseded by* 815 F.3d 1233 (9th Cir. 2016), and *overruled by McKinney v. Ryan*, 813 F.3d 798 (9th Cir. 2015) (en banc).

Hedlund's infancy and early childhood, in the 1960s and early 1970s, were filled with extreme neglect. (Tr. 7/28/1993 at 13–16.) *See also Hedlund*, 431 P.3d at 191 (Vasquez, J., dissenting). A mitigation expert testified at trial that Hedlund's living conditions were "probably as gruesome as anything that I have come across in 25-plus years in this business." (Tr. 7/28/1993 at 13.)

Hedlund and his siblings were left to fend for themselves. (Tr. 7/28/1993 at 13–14.) They were rarely clothed, and when they were clothed, the clothes were filth-encrusted. (Tr. 7/28/1993 at 14.) The children "ate only if they were able to get food themselves, and when they did, it was often moldy and rotten." *Hedlund*, 431 P.3d at 191 (Vasquez, J., dissenting). (Tr. 7/28/1993 at 14.) Animals were kept in the house, and animal feces, bile and urine were all over. (Tr. 7/28/1993 at 14.) Hedlund and his siblings' diapers were rarely changed. (Tr. 7/28/1993 at 14.)

Hedlund's mother and McKinney Sr. divorced when Hedlund was approximately six or seven. Hedlund remembered the divorce as traumatic and bitter. (ROA 259 at 12.) Hedlund and his siblings became pawns in his mother's acrimonious divorce. Bobbi left McKinney Sr. and moved to several states to hide from him, in an effort to escape her alcoholic, abusive husband. (Tr. 7/26/1993 at 76.) McKinney Sr. followed. (Tr. 7/26/1993 at 76.) Bobbi initially gained custody of Hedlund and his siblings in California, but during a visitation, McKinney Sr. kidnapped the children and brought them to Arizona. (ROA 259 at 13.)

McKinney Sr. then obtained legal custody of all of Bobbi's children, including Hedlund, though he disliked him because he was not biologically his child. (Tr. 7/28/1993 at 14–15; ROA 259 at 13.) Family members felt that Hedlund's mother Bobbi was not interested in spending time caring for her children, she was only interested in chasing men. (Tr. 7/28/1993 at 14–15.) Because of this,

1   and because the living conditions were so abhorrent, they agreed to testify for
2   McKinney Sr. when he became engaged in a custody battle with Bobbi, even though
3   he was a "big drinker." (Tr. 7/28/1993 at 15.)

4   It was the 1960s and early 1970s, and family members did not contact social
5   services or the police, and later felt guilt that they had not done anything. (Tr.
6   7/28/1993 at 15, 23.) They did not want to cause family problems. (Tr. 7/28/1993
7   at 15.) These same family members would later feel guilty about this decision as
8   Hedlund's life only worsened after he was taken from his mother's neglectful home.
9   (Tr. 7/28/1993 at 15.) Hedlund was thus separated from his mother for the bulk of
10  his childhood, without a single nurturing adult in his life.

11  After his divorce from Bobbi, McKinney Sr. married a woman named
12  Shirley.[4] From approximately ages seven to fourteen, Hedlund lived with his
13  mother's ex-husband and his abusive wife. "[T]he neglect continued, with the
14  addition of severe physical and mental abuse." *Hedlund*, 431 P.3d at 191 (Vasquez,
15  J., dissenting). Hedlund's aunt[5]—McKinney Sr.'s own sister—had explained that:
16  "these children had an extraordinarily abusive life, both physically and emotional,
17  as well as financially, and that Shirley was a terrible perpetrator of violence upon
18  Mike." (Tr. 7/28/1993 at 20.)

19  Shirley would constantly berate Hedlund, and physically abused him daily.
20  (Tr. 7/23/1993 at 80–86; Tr. 7/26/1993 at 4–21, 29–37, 81–88.) She would beat
21  Hedlund and his siblings with her fists and any objects within her reach—garden
22  hoses, belts with steel prongs, boards, old wooden stakes from the ground, and wire

---

[4] Although she was the other McKinney children's step-mother, Shirley McKinney was not technically Hedlund's step-mother. (Tr. 7/27/1993 at 7.) Hedlund believed that Shirley was his step-mother for many years, and many trial records describe her as such. Rather, she was his mother's ex-husband's wife. Neither adult who raised Hedlund—Shirley or McKinney Sr.—was biologically related to him.

[5] Again, McKinney Sr.'s sisters were not actually Hedlund's aunts, as McKinney was not his biologically father, but were referred to as such at trial and will be throughout this Petition.

1  hangers. (Tr. 7/23/1993 81–82; Tr. 7/26/1993 at 7.) The children had pots, frying

2  pans, and drinking glasses thrown at them as well. (Tr. 7/23/1993 at 82.) Hedlund's

3  sister testified at trial that Hedlund got the worst of it, because he was the oldest,

4  and that he would protect his siblings. (Tr. 7/23/1993 at 81.)

5      Their entire bodies were targeted for this abuse, including their heads. (ROA

6  259 at 12; Tr. 7/23/1993 at 81–82; Tr. 7/26/1993 at 6–7, 84–85; Tr. 7/27/1993 at

7  8.) Hedlund was hit in the head with a board no less than fifteen times as a child

8  (Tr. 7/26/1993 at 36), and the children were punched in the face at least once a day

9  (Tr. 7/26/1993 at 5). Hedlund was frequently kept home from school so teachers

10  would not see bruises and other signs of abuse. (Tr. 7/23/1993 at 83–84; Tr.

11  7/26/1993 at 14–15.) Other times, the children had to lie to teachers to say their

12  bruises and black eyes were from falling, or they had to wear long pants to hide

13  marks. (Tr. 7/23/1993 at 84.) A classmate testified that Mike missed a lot of school,

14  and that she saw him with bruises. (Tr. 7/26/1993 at 60.)

15      Shirley had a daughter, Sandra, who received favorable treatment. (Tr.

16  7/26/1993 at 29.) Sandra was older than Hedlund and would also beat and abuse

17  him. (Tr. 7/26/1993 at 29; Tr. 7/23/1993 at 82–83.) Shirley allowed her daughter to

18  abuse the children at will. (Tr. 7/23/1993 at 82; Tr. 7/26/1993 at 5.)

19      On the few occasions Hedlund and his siblings had the nerve to complain to

20  McKinney Sr. about the abuse they received at the hands of Shirley, they were

21  ignored. (Tr. 7/23/1993 at 83.) McKinney Sr. either did not believe their reports or

22  did not care. At times, McKinney Sr. would promise the children he would leave

23  Shirley, but he never did. (ROA 259 at 13; Amended PCR Petition, Mar. 27, 2000,

24  at App. A-13.)

25      McKinney Sr.'s sister testified at length at trial about the abuse the children

26  suffered at the hands of McKinney Sr. and Shirley. (Tr. 7/26/1993 at 73–109.) She

27  testified that McKinney Sr. had a serious drinking problem, and that her brother

28  frightened her. (Tr. 7/26/1993 at 107–09.) Three of McKinney Sr.'s other sisters—

8

Lee, Janet and Melba—spoke to the defense's mitigation specialist to detail the extensive abuse their brother and his wife had perpetrated upon Hedlund. (Tr. 7/28/1993 at 13–22.)

"A theme that pervades the family's recollections of Hedlund as a child was that he consistently tried to protect his siblings from the abuse and would take their beatings for them." *Hedlund*, 431 P.3d at 191–92 (Vasquez, J., dissenting). Hedlund attempted to protect his younger siblings, by interceding when his stepmother would attack them, even if it meant being beaten himself. (Tr. 7/23/1993 at 81; Tr. 7/26/1993 at 12, 84–85.) Once when Shirley was beating McKinney with a hose, Hedlund begged her to stop. (Tr. 7/26/1993 at 84–85.) Shirley then struck Hedlund across the temple and face with the hose and pushed him so violently that the back of his head banged the cement sidewalk. (Tr. 7/26/1993 at 85.) Hedlund was often beaten for things that McKinney had done. (Tr. 7/26/1993 at 20–21.) On one occasion, McKinney lit a tree on fire while his siblings, including Hedlund, were in a tree house in the tree. (Tr. 7/26/1993 at 20.) As the oldest sibling and not a McKinney child, Hedlund was beaten for "letting" his younger brother burn the tree. (Tr. 7/26/1993 at 20–21.)

Hedlund tried to protect his siblings outside of the home as well. For example, Hedlund protected his sisters from abusive boyfriends. (Tr. 7/27/1993 at 49.) He also stood up for McKinney when other kids were teasing him, and would intervene to stop him from getting in fights.[6] (Tr. 7/26/1993 at 93–94, 96.)

Hedlund protected his little sisters not only from their stepmother, but also from McKinney. (Tr. 7/26/1993 at 12.) McKinney and Hedlund's sister testified that even as a child, McKinney "provoked every fight there was and then would blame it on us." (Tr. 7/26/1993 at 11.) As a child, McKinney was violent and "scared the hell" out of his sister Donna. (Tr. 7/26/1993 at 10.) Donna testified:

---

[6] He would also try to protect friends who were threatened. (Tr. 7/26/1993 at 64–65.)

1  "James, James was always mean to everybody. It didn't matter who you were." (Tr.

2  7/26/1993 at 12.) McKinney would hit his siblings with shovels and rakes. (Tr.

3  7/26/1993 at 12.)

4       McKinney's sister Donna made clear that in contrast to McKinney, Hedlund

5  was "very, very mild mannered" and "always quiet." (Tr. 7/26/1993 at 11–12.)

6  McKinney's aunt noted that Hedlund was, in contrast to McKinney, "a real sweet

7  kid, real gentle." (Tr. 7/26/1993 at 85.) Another one of McKinney Sr.'s sisters

8  echoed that Hedlund was a decent, caring young man who ached for someone to

9  love him. (Tr. 7/28/1993 at 15.) This aspect of his personality did not change into

10  adulthood, and he was not known to be violent or aggressive towards anyone. (Tr.

11  7/26/1993 at 91.) Hedlund and McKinney's two sisters, along with McKinney Sr.'s

12  sisters, all contrasted Hedlund's sweet nature with McKinney's more volatile

13  nature—despite being more closely biologically related to McKinney (and in the

14  case of McKinney Sr.'s sisters, *only* biologically related to McKinney).

15       When he was around nine, Hedlund was attacked by McKinney Sr.'s dog,

16  who was trained to attack. (Tr. 7/26/1993 at 87.) Hedlund's injuries covered his

17  head, face, and neck, and he was covered in blood. (Tr. 7/26/1993 at 87; Tr.

18  7/23/1993 at 83.) He required hospital treatment, including 200 stitches to his face.

19  (Tr. 7/23/1993 at 83; Tr. 7/26/1993 at 87.) After returning home, Shirley and Sandra

20  woke up Hedlund at 5:00 a.m. and beat him because his stitches had cost money.

21  (Tr. 7/23/1993 at 83.) This was the sole doctor visit Hedlund experienced as a child.

22  (Tr. 7/26/1993 at 87; Tr. 7/28/1993 at 26.)

23       The neglect and emotional abuse Hedlund and his siblings suffered was as

24  devastating as the beatings. In fact, Hedlund thought it was worse: he told one

25  psychologist that he got used to the beatings, but he could never get used to the

26  "mental terror" under which he lived. (Amended PCR Petition, Mar. 27, 2000, at

27  App. A-14.)

28       While Shirley's daughter had her own room, Hedlund and his three siblings

shared a tiny room with bare mattresses, where animals, including pigs, a calf, a goat, chickens, and monkeys, were also kept. (Tr. 7/26/1993 at 29–30, 80.) The McKinneys kept snakes in the children's room, and Hedlund was terrified of snakes. (Tr. 7/26/1993 at 80.) If the children did not clean up the animals' feces, it sat there. (Tr. 7/26/1993 at 78.) McKinney Sr.'s sister referred to the children's tiny, filthy bedroom as the "horror room." (Tr. 7/26/1993 at 80.) She testified that the house was full of animals, covered in animal waste, and smelled like animal waste. (Tr. 7/26/1993 at 78.) The entire house was filthy, filled with animal waste, dirty diapers and other trash. (Tr. 7/26/1993 at 78–80.)

The degree of neglect of Hedlund and his siblings suffered was significant. They were teased for wearing the same filthy clothes to school every day. (Tr. 7/26/1993 at 79; Tr. 7/28/1993 at 18.) They had no shoes and no lunch. (Tr. 7/28/1993 at 18.) Someone who rode the bus with them testified that she remembered that "their hair wasn't combed. Their clothes, the buttons were missing off their shirts. Pants torn or too short or too big. Or, you know, shoes with holes in them and no socks. And it be would cold, no jackets. You know, just it was awful." (Tr. 7/26/1993 at 79.) She testified that the kids smelled like animal dung most of the time. (Tr. 7/26/1993 at 79.) Hedlund's sister testified at trial that the children were beaten for bringing home letters from teachers saying that "we were dirty, that we needed clean clothes, we needed new shoes." (Tr. 7/23/1993 at 84.) They were not allowed to eat or drink water unless Shirley allowed them. (Tr. 7/23/1993 at 85; Tr. 7/26/1993 at 5, 82–83.) They often had to resort to sneaking food or water. (Tr. 7/23/1993 at 85; Tr. 7/26/1993 at 81.) When they were caught, they were beaten. (Tr. 7/23/1993 at 85.) They were used as virtual slaves and beaten if they did not do their assigned work to Shirley's satisfaction. (Tr. 7/27/1993 at 8; Tr. 7/23/1993 at 85–86.)

When Shirley and her daughter would go shopping, out to eat, or to get ice cream, or leave the house for any reason, she would lock Hedlund and his siblings

1   in the house with strict orders to not eat or drink anything and a list of tasks. (Tr.

2   7/23/1993 at 85–86.) The children lived in fear of disobeying her orders, knowing

3   a beating would follow if they so much as had a drink of water. (Tr. 7/23/1993 at

4   85–86; Tr. 7/26/1993 at 3–5.) Shirley set strict limits: the food and water was "her

5   stuff" and the children were not allowed to touch it. (Tr. 7/26/1993 at 5.)

6        Shirley and her daughter Sandra would return home and sit in front of the

7   other children and eat their ice cream, and laugh at them. (Tr. 7/23/1993 at 86.)

8   Hedlund's sister testified that they were not allowed any enjoyment in their lives as

9   children. (Tr. 7/23/1993 at 86.)

10       When not locking the children inside, Shirley would lock them outside,

11  leaving them for hours if not the entire day in the harsh Arizona heat, without shade,

12  blistering and burning their skin. (Tr. 7/29/1993 at 18; Tr. 7/26/1993 at 6, 82.)

13  Hedlund's sister testified that this began when she was around three and Hedlund

14  was around eight, and occurred four or five times a month. (Tr. 7/26/1993 at 6, 8.)

15  Often they had no shoes, socks or shirts on to protect them. (Tr. 7/26/1993 at 8.)

16  They were left without food or water. (Tr. 7/26/1993 at 6–8, 82.)

17       Hedlund and his siblings would try to sneak over to neighboring houses to

18  ask for food because they were hungry. (Tr. 7/26/1993 at 81.) If Shirley discovered

19  that they had gone to try and sneak food, they would be beaten. (Amended PCR

20  Petiton, Mar. 27, 2000, at App. A-13; Tr. 7/26/1993 at 6–8, 81–83.) If Shirley

21  discovered they had been drinking from the hose, she beat them with the hose all

22  over their bodies. (Tr. 7/26/1993 at 7.)

23       Hedlund's aunt, who was McKinney Sr.'s sister, testified that she and her

24  mother tried to confront Shirley and McKinney about their treatment of the kids,

25  after they found them locked outside all day in 110 degree heat in their underwear,

26  without shoes, and blistered red—but nothing happened. (Tr. 7/26/1993 at 81–83,

27  86.)

28       At times, Shirley would not allow the children into the house unless they

12

stole something she wanted and brought it to her as payment. (Tr. 7/26/1993 at 9–10.) Hedlund did not want to steal, but McKinney would steal for Shirley and received preferential treatment as a result. (Tr. 7/26/1993 at 30.) McKinney Sr. "always told his kids you can do anything you want as long as you don't get caught." (Tr. 7/28/1993 at 19.) McKinney Sr.'s sister described her brother as "the kind of guy who wouldn't beat his children for stealing, but would beat them if they got caught." (Tr. 7/28/1993 at 23.)

As soon as he was able, Hedlund began trying to run away, to escape. When he was approximately fourteen, Hedlund ran away to his mother. (Tr. 7/26/1993 at 32.) Shirley and McKinney Sr. went and got Hedlund and brought him back to their house, where Shirley beat him repeatedly, giving him two black eyes. After the beatings, she told Hedlund: "You can go live with your whore of a mother." (Tr. 7/26/1993 at 12–13.) She made clear that she beat him so he would have a beating "for the road," one to remember. (Tr. 7/26/1993 at 12–13.) Hedlund's siblings also left as soon as they were able. (ROA 259 at 13.) Due to the abuse she experienced, at the time of trial, Hedlund's sister Donna had not spoken to her father, McKinney Sr., in more than eight years—since she was a teenager. (Tr. 7/26/1993 at 41.)

After leaving the McKinneys', Hedlund then lived with his biological mother, and her then-husband off and on for five years. (Tr. 7/26/1993 at 13; ROA 259 at 13.) Though he was no longer beaten daily and psychologically tortured, his mother again severely neglected him. She set no limits, and provided no structure or nurturing, and allowed him to drop out of school. (Tr. 7/28/1993 at 46–47.) At the age of fourteen, he had to fend for himself. Hedlund had no real relationship with his other half-brother, Chris Morris, until he moved back in with his mother, but they grew to be very close. (Tr. 10/29/1992 at 47, 107.)

Hedlund quit school in the ninth or tenth grade so he could work picking crops. (Tr. 7/28/1993 at 46–47; Amended PCR Petition, Mar. 27, 2000, at App. A-14.) He had become unmotivated in school after facing taunts from peers due to his

1  appearance (Tr. 7/26/1993 at 79, 83; Tr. 7/28/1993 at 18; Amended PCR Petition,
2  Mar. 27, 2000, at App. A-14), and after falling behind due to having been kept home
3  from school as a child by Shirley to hide signs of abuse (Tr. 7/26/1993 at 14–15,
4  88; Amended PCR Petition, Mar. 27, 2000, at App. A-14).

5      Hedlund moved away from his mother to Arkansas to try to make a fresh
6  start. This effort to start anew did not work out for Hedlund. He was depressed and
7  unhappy. Hedlund attempted suicide and was hospitalized for four days. (Tr.
8  7/26/1993 at 13–14.) He returned home to Arizona. (Tr. 7/26/1993 at 14; ROA 259
9  at 13.)

10      **2.     Young adulthood**

11      Hedlund's abusive childhood caused him to be extremely close with his
12  siblings, and especially close to his half-brother McKinney. (Tr. 10/13/1992 at 12–
13  13.) They remained close as they grew older, though McKinney tried to control
14  Hedlund. (Tr. 7/26/1993 at 15–16.)

15      Hedlund consistently maintained employment, even as a teenager, and was
16  never fired. (Tr. 7/28/1993 at 46–47.) For four years before this crime, starting when
17  he was around 22 years old, Hedlund successfully worked as a construction worker.
18  (Tr. 7/23/1993 at 33–34.) At the time of the crime, in 1991 he was making $9.50 an
19  hour and making overtime. (Tr. 7/23/1993 at 28, Trial Ex. 1.) He had worked his
20  way up from $7.00 an hour by being hardworking and dependable. (Tr. 7/23/1993
21  at 37.) He went to work every day, and was not in need of money. (Tr. 7/27/1993
22  at 50; Tr. 7/28/1993 at 26.) His supervisors saw him as hard-working, dependable
23  and trustworthy. (Tr. 7/23/1993 at 29–30, 33.) He never once asked for an advance
24  on his salary. (Tr. 7/23/1993 at 31.) His office manager was astonished that he had
25  been arrested for these crimes, as it was "just not Mike." (Tr. 7/23/1993 at 32.) She
26  noted that he "was always helping people and doing things for other people and
27  going out of his way to do things." (Tr. 7/23/1993 at 32.)

28      Others expressed similar sentiments, echoing comments that Hedlund had

been a sweet child. At trial, a former girlfriend testified that Hedlund was a "loving and caring person," who was a great friend and boyfriend. (Tr. 7/23/1993 at 68.) She testified that Hedlund cared deeply about his family and his work, and was never violent. (Tr. 7/23/1993 at 68, 70.) Hedlund's sister testified that Hedlund was timid, and she had never known him to hurt anyone. (Tr. 7/26/1993 at 15.) His other sister echoed this. (Tr. 7/27/1993 at 49.)

As a young adult in his early 20s, Hedlund had extra income that he shared with his family. (Tr. 7/23/1993 at 79; Tr. 7/27/1993 at 50–51.) At the time of the crime, Hedlund was living with his sister Donna, paying rent every month. (Tr. 11/5/1992 at 78–79, 82; Tr. 7/23/1993 at 78–79.) His only expenses were rent and payments on a stereo. (Tr. 7/23/1993 at 78–79.) Beyond that, he lived within his means, with no debt. (Tr. 7/23/1993 at 78–79; Tr. 7/27/1993 at 50.) Hedlund's sisters would leave their children in his care. (Tr. 7/26/1993 at 22, 25; Tr. 7/27/1993 at 47–48.) When they needed it, he gave money to his sisters and his mother. (Tr. 7/23/1993 at 79; Tr. 7/27/1993 at 50; Tr. 7/28/1993 at 26.)

When Hedlund moved out of the McKinney home to live with his mother, he no longer saw McKinney as often. McKinney began acting out and ended up in prison. While in prison, McKinney would call his sister and tell her that if he ever went back, he was not going down alone, and not going back for small-time crimes. (ROA 259 at 12.) She worried about him because she believed all he knew how to do was commit crimes, and that he tried to deal with his abusive childhood by hurting others. (ROA 259 at 11.)

McKinney got out of prison in December 1990, and he and Hedlund began to spend time together again. (ROA 259 at 13–14.) For Hedlund, this was an ill-fated attempt to protect his half-brother and try to straighten him out. (ROA 259 at 13–14; Tr. 7/23/1993 at 67.) McKinney got a job, but lost it within a month. (Tr. 11/4/1992 at 8.) When McKinney got out of prison, he was mean and demanding toward Hedlund. (Tr. 7/26/1993 at 15–16.) McKinney commandeered Hedlund's

car within a week of his release. (Tr. 7/26/1993 at 89–90.) McKinney told his aunt and uncle he wanted a car, and when they said he needed to get a job and save money first, McKinney responded: "Why? I can just get Michael's." (Tr. 7/26/1993 at 90.) McKinney told Hedlund: "You cannot have this vehicle. This is mine now." (Tr. 7/26/1993 at 27.)

McKinney would go to Hedlund's residence and demand that Hedlund get in his car and go out with him. (Tr. 7/26/1993 at 27–28.) Hedlund went along with McKinney because he felt sorry for him because he had no other friends, and Hedlund worried that if he was not there for him, his brother would "go right back to prison." (Tr. 7/26/1993 at 15.) Hedlund was irritated by his brother after he got out of prison. (Tr. 7/26/1993 at 28.) Hedlund felt a responsibility to be there for his brother, even though, in the words of McKinney and Hedlund's sister, "when he got out, James was very mean to Michael." (Tr. 7/26/1993 at 15.) As discussed above, this was typical of McKinney's behavior throughout his life.

When McKinney was released a few months before the crime, he began living with his aunt, with whom McKinney Sr. and Shirley also lived at that time. (Tr. 7/26/1993 at 89–91.) As a result of McKinney bringing Hedlund to this aunt's house, Hedlund saw McKinney Sr. and Shirley again for the first time in years shortly before the crime. (Tr. 7/26/1993 at 88–92.) This aunt encouraged Hedlund to speak to McKinney Sr., and he did so. She later regretted this, since Hedlund explained that he did not want to because Shirley was there and being around her made him feel sick. (Tr. 7/26/1993 at 92.)

Hedlund self-medicated his depression and post-traumatic stress disorder ("PTSD") resulting from his childhood by drinking. (Tr. 7/27/1993 at 15–16, 78.) He was an alcoholic by age twenty-two, albeit a functional one. (Tr. 7/27/1993 at 97.) While his sister Dianna lived with Hedlund, she noticed that he would drink a six-pack after work, and a case of beer over the weekend. (Tr. 7/27/1993 at 51–52.) Hedlund never became violent, but did get tired after drinking. (Tr. 7/27/1993 at

51.) In the months leading to the crimes, Hedlund's drinking increased significantly, coinciding with McKinney's release from prison and his renewed contact with his stepfather and Shirley. (Tr. 7/23/1993 at 30–31, 35–36.) Multiple witnesses at trial testified about his heavy drinking leading up to the crime. (Tr. 7/23/1993 at 30–36; Tr. 7/26/1993 at 55.)

According to McKinney and Hedlund's sister, "whatever James said Michael did." (Tr. 7/26/1993 at 21.) "[W]hen James came out of prison it was like he took over." (Tr. 7/26/1993 at 27.) Hedlund confided in an ex-girlfriend that he was distressed about the situation because McKinney was "up to his old things and had broken into houses." (Tr. 7/23/1993 at 67.) When she advised him to avoid McKinney, Hedlund replied: "That's very impossible, with him being my brother." (Tr. 7/23/1993 at 67.) One witness described Hedlund's relationship with McKinney prior to the crime as a "twisted loyalty to the only family he knows." (Tr. 7/28/1993 at 24.)

Hedlund and McKinney's brother-in-law, a fire marshal, testified that Hedlund was working regularly at the time of the crime, living with him and his family, paying his share of rent, helping with the house's upkeep, and supporting his sister. (Tr. 11/5/1992 at 74–75, 78–79.) He respected Hedlund and thought he was a hard-working guy; he had never seen Hedlund violent. (Tr. 11/5/1992 at 81.) As one witness put it, "[n]one of the family members were surprised by the accusations against James. They were in utter disbelief that Michael could have been involved. That was across the board." (Tr. 7/28/1993 at 25.) Hedlund had no history of violent criminal behavior. (Tr. 7/28/1993 at 28.)

### B.     The Crime

Christine Mertens was found dead in her home on March 10, 1991. (Tr. 10/21/1992 at 64–68.) Jim McClain was found dead in his home on March 23, 1991. (Tr. 10/21/1992 at 106–11.) McKinney and Chris Morris, McKinney and Hedlund's younger half-brother, planned to enter and burglarize Ms. Mertens's home on

17

1    February 28, 1991, a few weeks earlier. (Tr. 10/29/1992 at 45–46, 52–54.) That

2    night, McKinney, Morris, and Hedlund were out in Hedlund's car with Joe Lemon,

3    Morris's friend. (Tr. 10/29/1992 at 53.) McKinney needed two or three thousand

4    dollars to pay a debt, so he was looking for a place to rob. (Tr. 10/29/1992 at 54–

5    55.) Lemon and Morris volunteered that their friend's mother Christine Mertens

6    kept cash in her house. (Tr. 10/29/1992 at 57–58.)

7        McKinney insisted Morris and Lemon show him Ms. Mertens's home, so

8    they drove there. (Tr. 10/29/1992 at 56–58.) Hedlund was not interested in robbing

9    homes and said so. (Tr. 10/28/1992 at 64, 67, 119; Tr. 10/29/1992 at 135–36.)

10   Morris and McKinney planned to enter the home until Ms. Mertens pulled up. (Tr.

11   10/29/1992 at 135–37.)

12       That same night, on February 28, Morris told McKinney about a nearby

13   house that they could rob. (Tr. 10/29/1992 at 66–67.) McKinney and Morris entered

14   the house. (Tr. 10/29/1992 at 68–69.) Morris and McKinney later burgled two other

15   houses. (Tr. 10/29/1992 at 74–77, 128.) Hedlund never entered any homes, he

16   waited in the car, and only took a few dollars in coins, such as wheat pennies, that

17   neither McKinney nor Morris wanted. (Tr. 10/29/1992 at 81–82, 118, 128–29.)

18       During one of the burglaries, Hedlund drove off because he saw police and

19   got scared, leaving Morris and McKinney behind. (Tr. 10/29/1992 at 79, 127.)

20   Hedlund stayed in the car because he was scared of being caught by people in the

21   house. (Tr. 10/29/1992 at 118–19.) The only context in which Morris ever heard

22   Hedlund contemplate going into a house was after he knew Morris was planning to

23   go in, because he was afraid of his younger half-brother getting caught, and wanted

24   to protect him. (Tr. 10/29/1992 at 135–37.)

25       Defense counsel was not allowed to bring out exculpatory statements through

26   Morris, such as Hedlund telling Morris he was burying the gun so McKinney could

27   not kill again. (Tr. 11/5/1992 at 66.)

28       The only physical evidence of Hedlund's presence during any of the murders

18

was a fingerprint on a briefcase that Mr. McClain used to store car titles. (Tr. 11/2/1992 at 123–33; Tr. 10/26/1992 at 120.) However, evidence at trial indicated that there was an innocuous explanation for this. The prosecution stipulated that Hedlund bought a car from Mr. McClain prior to the crime, so it was entirely plausible that Hedlund touched the briefcase when he bought the car. The State's own expert testified there was no way to tell when the fingerprint was placed on the briefcase. (Tr. 11/4/1992 at 42; Tr. 11/2/1992 at 135.) Further, McKinney always insisted everyone wear gloves during burglaries to avoid fingerprints. (Tr. 11/2/1992 at 16–17.)

Since the verdict was rendered, additional evidence has come to light indicating that Hedlund was not present when the murders occurred and did not know about the murders until after they were committed by his brother, which is consistent with his prior actions in the other burglaries in the preceding weeks in which he simply drove the car.

## C. Procedural History

### 1. Pretrial Proceedings

On April 1, 1991, Hedlund was arrested in Mesa, Arizona, by the Chandler Police for the separate burglaries and murders of Christine Mertens and Jim McClain. (ROA 11c.) On April 11, Hedlund and his co-defendant and half-brother, James McKinney, were indicted on two counts of first-degree murder and lesser charges relating to the burglaries. (ROA 1.) Maricopa County Deputy Public Defender Peter Leander was appointed to represent Hedlund[7] (ROA 10), and the case was assigned to the Honorable Steven Sheldon (ROA ME 4).

On May 22, 1991, the State noticed its intention to seek the death penalty. (ROA 26.) Prior to trial, Leander filed an unopposed motion to sever Hedlund and McKinney's trial. (ROA 40.) The judge granted the motion (ROA 18), however, less than a month later, he *sua sponte* raised the idea of trying Hedlund and

---

[7] This was Leander's first death penalty case. (Tr. 12/7/1992 at 4.)

1    McKinney together before two different juries. (Tr. 1/20/1992 at 67.) Defense

2    counsel pointed out that the presentation of McKinney's defense would prejudice

3    Hedlund's defense. (Tr. 10/13/1992, pretrial motions hr'g, at 11, 13–14.) Counsel

4    for Hedlund was also concerned the dual-jury procedure would limit his ability to

5    cross-examine witnesses under *Bruton v. United States*, 391 U.S. 123 (1968).[8] (Tr.

6    10/13/1992, pretrial motions hr'g, at 11–12.) The prosecutor, counsel for

7    McKinney, and counsel for Hedlund opposed the dual-jury procedure. (Tr.

8    1/20/1992 at 67; ROA 41, 42.) Despite this, the judge ordered that a dual-jury

9    procedure be employed. (ROA ME 24).

10        Leander filed a petition for special action in the Arizona Court of Appeals,

11   which granted relief. *Hedlund v. Superior Court*, 832 P.2d 219 (Ariz. Ct. App.

12   1992). The Arizona Supreme Court, however, reversed the lower court and allowed

13   the dual-jury order to stand. *Hedlund v. Sheldon*, 840 P.2d 1008 (Ariz. 1992).

14        On September 18, 1992, the prosecution and defense counsel entered into a

15   plea agreement for Hedlund: second degree murder, ten to twenty years; class 4

16   theft and class 2 burglary, non-dangerous, to run concurrently, with no agreement

17   as to term of sentence.[9] (Tr. 10/13/1992, evid. hr'g, at 4–5.) Prior to the entry of this

18   agreement, the judge received a number of letters from McClain's family urging

19   him to reject it. (Tr. 10/13/1992, evid. hr'g, at 24–26.) The judge ultimately

20   disallowed the plea because he wanted more accountability for McClain's death.

21   (Tr. 10/13/1992, evid. hr'g, at 26.) When counsel sought to present a new plea

22   agreement bearing other terms four days past the court's deadline, the court rejected

23   it for untimeliness. (Tr. 10/13/1992, evid. hr'g, at 18–19.) The judge also noted the

24   extensive preparations his staff had undertaken for the dual juries as a justification

---

[8] *Bruton* held that the admission of a codefendant's confession violated the Confrontation Clause and that co-defendant statements create a prejudicial risk during joint trials. *Id.* at 126.

[9] Upon information and belief, no such agreement was reached with McKinney.

1   for rejecting the plea. (Tr. 10/13/1992, evid. hr'g, at 44–45.)

2           **2.**      **Trial: Guilt Phase**

3        A few days prior to jury selection, Leander requested the appointment of as

4   second counsel (ROA 80; Tr. 10/13/1992, pretrial motions hr'g, at 35 (noting that

5   he should have asked for second counsel sooner)), which was granted the day trial

6   began (ROA ME 35). Both counsel again expressed concern their cross-

7   examinations of Joe Lemon and Chris Morris would create *Bruton* problems and

8   that these teenage witnesses—central to the case—were too unsophisticated to

9   properly prepare to avoid this. (Tr. 10/26/1992 at 23–24.) The solution, suggested

10  by the prosecutor, was to allow the prosecutor to intentionally lead the witnesses on

11  direct, especially Lemon and Morris. (Tr. 10/28/1992 at 13.) The record

12  demonstrates these two teenage witnesses were especially susceptible to leading

13  and ambiguous questions because their answers changed frequently, depending

14  upon how the question was phrased. (Tr. 10/28/1992 at 37–132; Tr. 10/29/1992 at

15  42–185.)

16       Before the examination of Lemon and Morris, defense counsel expressed

17  concern about these witnesses being questioned in terms of "they" or "we", without

18  any delineation being made between Hedlund and McKinney. (Tr. 10/28/1992 at

19  9–10.) The court agreed, noting the prosecutor should caution Lemon and Morris

20  on "we" or "they" statements. (Tr. 10/28/1992 at 10.) Despite his earlier

21  admonishment, the judge allowed the prosecutors to phrase questions in terms of

22  "did *they* say this?" or "did *James or Michael* do that?" (*See, e.g.*, Tr. 10/28/1992

23  at 54; Tr. 10/29/1992 at 58, 66.) Counsel renewed his objection and requested that

24  the people be "delineated," but the judge overruled this objection. (Tr. 10/29/1992

25  at 58–59.) It was later revealed during their testimony that these witnesses often

26  meant either McKinney and/or Morris, not Hedlund, when answering the

27  prosecutor's "they" questions, but not all instances were clarified. The judge relied

28  heavily on this unclear and misattributed evidence in sentencing Hedlund to death.

1    (*E.g.*, Tr. 7/30/1993 at 11.)

2         Witnesses at testified Hedlund wanted nothing to do with the burglaries

3    perpetrated by McKinney and Morris. (Tr. 10/28/1992 at 54–55, 98–103, 119, 122,

4    128–29, 132; Tr. 10/28/1992 at 61–63.) At trial, counsel for Hedlund and counsel

5    for McKinney undermined each other's defense, a situation to which each

6    strenuously objected. (Tr. 11/2/1992 at 149–152.) On November 12, 1992,

7    McKinney's jury reached a verdict, convicting him of two counts of first degree

8    murder and lesser charges. (ROA 56b.) That same day, during deliberations,

9    Hedlund's jury sent a note to the judge asking whether Hedlund could "be convicted

10   as an accomplice to the burglary and not be convicted in the murder charge." (ROA

11   118.) The Hedlund jurors then returned their verdicts acquitting him of first-degree

12   murder for the death of Ms. Mertens but finding him guilty of second-degree

13   murder; and convicting him of first-degree murder for the death of Mr. McClain

14   along with lesser charges. (ROA 56c-d, 120.)

15                    **3.    Trial: Sentencing Phase**

16        The State filed its notice of aggravating factors, alleging statutory factors

17   pursuant to Arizona Revised Statutes ("A.R.S.") § 13-703(F)(2) (prior violent

18   conviction), (F)(5) (pecuniary gain), and (F)(6) (heinous, cruel and depraved) (West

19   1992). (ROA 129a.) Hedlund's sentencing hearing was held from July 26 through

20   July 28, 1993. The State presented no witnesses and rested upon the evidence

21   adduced at trial. (Tr. 7/23/1993 at 7.) Multiple lay witnesses, including family

22   members, testified about Hedlund's horrific childhood abuse. *See* Hedlund's

23   Personal History, *supra*. The court found this to be compelling and credible. (Tr.

24   7/30/1993 at 25.) Witnesses also testified about his stable job and lack of a need for

25   money, and his ongoing attachment to his siblings, his relationship with his brother,

26   and his drinking. *See* Hedlund's Personal History, *supra*.

27        Two expert mental health witnesses testified on Hedlund's behalf as well.

28   Dr. Ronald Holler, Ed.D., evaluated Hedlund prior to sentencing by administering

a number of psychological tests. (Tr. 7/27/1993 at 6.) Dr. Holler had over twenty-eight years' experience working with the mentally ill and abused children. (Tr. 7/27/1993 at 4.) The State had no objections to Dr. Holler's credentials as an expert witness. (Tr. 7/27/1993 at 5.) Dr. Holler testified about Hedlund's abusive childhood, and his resulting psychological impairments, alcoholism, and attachment to his siblings. (Tr. 7/27/1993 at 4–10, 16–17, 24, 36.)

Dr. Holler found indications of right hemisphere brain dysfunction, as Hedlund scored 13 IQ points lower for this hemisphere. (Tr. 7/27/1993 at 18–19.) He testified that damage to the right hemisphere can affect a person's judgment and learning. (Tr. 7/27/1993 at 19–20.) Dr. Holler testified that Hedlund's childhood abuse caused lasting neuropsychological impairments, as reflected, in part, by a disparity in his IQ scores. (Tr. 7/27/1993 at 18–19.) He testified that physical abuse, such as striking against the back of the head multiple times (as happened to Hedlund) could lead to impairment. (Tr. 7/27/1993 at 17–18.) Dr. Holler testified that Hedlund had neurological impairments, which impaired his judgment and his ability to conform his conduct to the law. (Tr. 7/27/1993 at 21.)

Dr. Holler testified that Hedlund's abuse left him with battered child syndrome, a subset of PTSD, as well as repressed, low-grade, chronic depressive disorder. (Tr. 7/27/1993 at 9–10, 16–17.) This was exacerbated by Hedlund's knowledge that he was biologically different than his siblings. (Tr. 7/27/1993 at 8–9.) Hedlund "became dependent on others, particularly members of his family, in order to develop a degree of some type of family relationship that most people have." (Tr. 7/27/1993 at 9.) Dr. Holler further opined that these findings were:

> significant in attempting to understand how he could have become involved in these criminal activities in the sense that he was very needy, he didn't have a very clear understanding of himself and what he should do as a responsible and effective kind of adult, and how he could be led into doing some activities and being associated with people who were very much involved in criminal activities in order to express his loyalty and desire to be accepted as a person.

(Tr. 7/27/1993 at 9.)

Dr. Holler testified that as a result of their tortured childhood, Hedlund was extremely loyal to his siblings and desperate to be accepted by his family. *Hedlund*, 431 P.3d 181, 192 (Vasquez, J., dissenting). Dr. Holler testified that due to his childhood trauma and resulting impairments, Hedlund had a "very strong tendency" to be accommodating to others and to be agreeable by avoiding conflict, especially with McKinney. (Tr. 7/27/1993 at 24, 36.) He testified that as a result of his severe child abuse, Hedlund was unable to adequately conceptualize the consequences of spending time with his brother, and instead focused on being close with his brother. (Tr. 7/27/1993 at 34.)

Both Hedlund's PTSD and his brain damage, which were the result of his childhood trauma, compounded his memory problems. (Tr. 7/27/1993 at 24). Because of these impairments, Hedlund was significantly impaired in his capacity to conform his conduct to the law. (Tr. 7/27/1993 at 21.)

Hedlund also presented testimony about his long-term substance abuse. (*See, e.g.*, Tr. 7/27/1993 at 60–78.) Dr. Holler testified that childhood abuse had led Hedlund to become an alcoholic, and his alcohol dependence was "intertwined with" his PTSD. (Tr. 7/27/1993 at 7–10, 14.) Hedlund's alcoholism was a reaction to his childhood and resultant PTSD and depression; an attempt to "self-medicate" and "drown" the deep, lasting distress that resulted from his chaotic, abusive, and neglectful childhood. (Tr. 7/27/1993 at 10, 15–16.)

Dr. Charles Shaw, M.D., the director of the chemical dependency unit at a Phoenix Hospital, and an expert on alcoholism and addiction, echoed Dr. Holler. (Tr. 7/27/1993 at 60–100.) He evaluated Hedlund prior to sentencing and testified about Hedlund's alcohol dependence diagnosis. (Tr. 7/27/1993 at 60–100.)

Dr. Shaw testified that alcoholism hurts cognitive function, specifically, memory and judgment, and that an alcoholic will suffer these effects even if they are not currently intoxicated. (Tr. 7/27/1993 at 66–67, 74.) Like Dr. Holler, Dr.

1   Shaw testified that Hedlund depended on alcohol to self-medicate his emotional
2   stress so that he could function. (Tr. 7/27/1993 at 74–78.)

3       He explained how Hedlund could have a serious alcohol addiction and still
4   hold his job and pay his bills—as many as 95% of alcoholics are "functional"
5   alcoholics. (Tr. 7/27/1993 at 66.) He also explained how Hedlund could have
6   hidden his drinking from friends and family. (Tr. 7/27/1993 at 72.)

7       Dr. Shaw and Dr. Holler concluded Hedlund suffered from alcoholism at the
8   time of the offenses and that, because alcohol can cause the user to act out-of-
9   character, Hedlund's ability to conform his conduct to the law was impaired. (Tr.
10   7/27/1993 at 32, 71, 85, 100.)

11       Hedlund's half-sister, Dianna McKinney, testified that Hedlund would
12   regularly drink a six pack every night during the week, after work. (Tr. 7/27/1993
13   at 51.) On weekends, Hedlund would drink about a case, sometimes more, between
14   Friday and Sunday. (Tr. 7/27/1993 at 51–52.) At times, Hedlund would drink so
15   much that he had to be helped out of his car and carried up the stairs to his
16   apartment. (Tr. 7/27/1993 at 59.) Hedlund would consume so much alcohol that he
17   could not walk and was not aware of his surroundings. (Tr. 7/27/1993 at 59.) This
18   was consistent with trial testimony which established that Hedlund would drink
19   until he fell asleep and that he drank during the burglaries. (Tr. 10/28/1992 at 50,
20   108; Tr. 10/29/1992 at 112, 122–23, 130–31, 172.)

21       Dorothy Malbe was the office manager at the stucco company where
22   Hedlund worked, and she knew him for nine years prior to the crimes. (Tr.
23   7/23/1993 at 26–27, 29, 34.) The people who worked most closely with Hedlund in
24   the field, including his foreman, had informed Ms. Malbe that in the time just before
25   the murders, Hedlund was drinking "very, very heavily." (Tr. 7/23/1993 at 30–31,
26   35.) People had been concerned about his drinking for about six months prior to his
27   arrest, though it did not affect his work. (Tr. 7/23/1993 at 35–36.)

28       It was also established that Hedlund was convicted of three prior alcohol-

1  related offenses. Hedlund received a liquor violation and a DWI prior to the crimes.

2  (Tr. 7/28/1993 at 10.) Monsignor Edward Ryle, a priest, also testified on Hedlund's

3  behalf. (Tr. 7/26/1993 at 44.)

4     On July 30, 1993, the court sentenced Hedlund to death. (Tr. 7/30/1993 at

5  26.) In his special verdict, the judge noted there was no evidence that Hedlund shot

6  Mr. McClain, but found that he had "associated himself with a known killer" (his

7  brother) and assisted in providing and concealing the murder weapon. (Tr.

8  7/30/1993 at 8–9.) The judge found two aggravating factors: prior conviction for a

9  crime of violence (for the second-degree murder of Ms. Mertens) and pecuniary

10 gain. (Tr. 7/30/1993 at 13–17.) The judge did not find the (F)(6) aggravator. (Tr.

11 7/30/1993 at 17.)

12    He recognized Hedlund's severely abusive childhood as compelling and

13 credible,[10] but not sufficiently substantial to call for leniency because Hedlund

14 failed to link his childhood with his state of mind at the time of the offense. (Tr.

15 7/30/1993 at 24–25.) In assessing Hedlund's brain impairment and substance

16 addiction, the court again framed the question in terms of whether Hedlund had

17 proven a causal connection. The judge ignored Drs. Holler and Shaw's testimony,

18 and instead limited his analysis to whether any mitigating factors "affected the

19 defendant's ability to control his physical behavior at the time of the offense or to

20 appreciate the wrongfulness of his conduct," and found they did not. (Tr. 7/30/1993

21 at 23–24.)

22           **4.    Appellate Proceedings**

23    After consolidating the brothers' appeals, the Arizona Supreme Court on

24 direct appeal affirmed Hedlund's convictions and sentences, after striking the (F)(2)

25

26 _____

27 [10] The judge stated: "I don't think anyone could listen to the evidence presented by
your sisters without feeling a great deal of anguish and compassion for the kind of
28 existence that you lived as a small child," and commended Hedlund for some of the
qualities that he exhibited as a child. (Tr. 7/30/1993 at 25.)

aggravating factor, leaving pecuniary gain, (F)(5), as the sole remaining factor.[11] *State v. McKinney*, 917 P.2d 1214, 1231, 1234 (1996). It conducted an independent review of Hedlund's sentence and affirmed the trial court's analysis.

Hedlund filed his post-conviction petition on August 16, 1999, and an amended petition on March 27, 2000, which were denied without an evidentiary hearing on June 1, 2001. Hedlund's Petition for Review in the Arizona Supreme Court was also denied. (PFR Docs. 1, 8.)

In post-conviction, Hedlund's counsel retained experts to determine the extent of Hedlund's brain damage and mental impairment. These experts linked Hedlund's childhood abuse, head injuries, and alcohol abuse as contributing to brain damage. Dr. Marc Walter, Ph.D., conducted a battery of neuropsychological tests and concluded that Hedlund has brain damage. (*See* Amended PCR Petition, App. A13–A20, Mar. 27, 2000 ("Walter Report").) Dr. Walter diagnosed Hedlund with Cognitive Disorder, explaining that "this diagnosis used to be termed Organic Mental Disorder and indicates the presence of brain damage." (Walter Report at 4.) Dr. Walter also observed that Hedlund may still have residual problems with his PTSD. (Walter Report at 4.)

Dr. Walter concluded that Hedlund's brain damage was present at the time of the crime and that it was "quite likely, in fact, that he would have been more impaired at that time as he was actively drinking large amounts of alcohol on a daily basis." (Walter Report at 4.) This conclusion was supported by Hedlund's improvement on the WAIS-R IQ test. Dr. Walter connected Hedlund's drinking, brain damage, and abusive childhood to Hedlund's state of mind at the time of the

---

[11] Hedlund's single aggravator—pecuniary gain, where the crime was not a murder-for-hire—has been eliminated as an aggravating factor in Arizona. *See* A.R.S. § 13-751 (West 2019); *see also* former § 13-703 (F)(5) (West 1992). The Arizona legislature has determined that the conduct that aggravated Hedlund's crime and made him eligible for a death sentence in his case no longer makes one among the narrow class of people who are eligible for the death penalty.

crime:

> at the time of the offenses, Mr. Hedlund's brain damage (which was augmented and aggravated by his use of alcohol) prevented him from realizing the implications of his behavior, that is, to understand the consequences of his involvement in the burglaries and the murders, as well as to conform his behavior to the law. Although another factor involved in the murders was his history of childhood abuse and attendant PTSD, it is, in my opinion, the brain injury which had much more of an impact upon his behavior.

(Walter Report at 4.)

The post-conviction judge, who had been the trial judge, had concluded at sentencing that the opinions of the experts at trial had no value (though they were uncontroverted). (Tr. 7/30/1993 at 18–19, 20–21.) However, sitting as the post-conviction judge, the judge embraced the reports and testimony of trial experts Drs. Shaw and Holler as having "adequately informed" the court of the evidence of Hedlund's neuropsychological deficits as reason to deny Hedlund an evidentiary hearing on these matters. (Minute Entry Denying Petition for Post-Conviction Relief, May 31, 2001, at 6.)

### 5. Federal Habeas Proceedings

Federal habeas corpus proceedings commenced on January 18, 2002, Petition for Writ of Habeas Corpus, *Hedlund v. Ryan*, No. CV-02-0110-PHX-DGC[12] (D. Ariz. Jan. 18, 2002), Dist. Ct. Doc. 1; and relief was denied on August 10, 2009, Memorandum of Decision and Order, *Hedlund v. Ryan*, No. CV-02-0110-PHX-DGC (D. Ariz. Aug. 10, 2009), ECF No. 147.

In habeas corpus proceedings, additional experts have supported the

---

[12] That case was initially filed naming then-Arizona Department of Corrections Director Terry Stewart, et al., as Respondents and the case was assigned to Judge Stephen McNamee. At the time the case was decided and at the time of the most recent docket entry, then-Director Charles Ryan, et al., were named as Respondents and Judge David Campbell was assigned. Hedlund will thus refer to this proceeding throughout this Petition as *Hedlund v. Ryan*, No. CV-02-0110-PHX-DGC.

conclusion that Hedlund suffers from brain damage and mental impairment. Ricardo Weinstein, Ph.D., a neuropsychologist, found that Hedlund suffers from "bilateral diffuse mild to moderate brain dysfunction." Motion for Record Expansion and Evidentiary Development, *Hedlund v. Ryan*, No. CV-02-0110-PHX-DGC (D. Ariz. Aug. 2, 2004), Dist. Ct. Doc. 106, Ex. 10 ("Weinstein Declaration") at 9.)

Dr. Weinstein examined the etiology of Hedlund's mental impairments and cognitive deficits. He concluded that they were "indications of insults to his developing and developed brain, as well as numerous traumatic brain injuries." (Weinstein Declaration at 12–13.) Hedlund's "neurological deficiencies were caused or exacerbated by repeated physical trauma to his head, including multiple head injuries suffered as a result of accidents, falls, and abuse inflicted by his stepmother, stepfather, and possibly mother." (Weinstein Declaration at 13.)

Dr. Weinstein found that Hedlund started drinking heavily, likely as a means of "self medicating" his depression, and that "Hedlund's alcohol addiction caused or exacerbated his deficits." (Weinstein Declaration at 14.) Hedlund also was in a series of car accidents that caused traumatic head injuries. (Weinstein Declaration at 14.) Dr. Weinstein ultimately linked Hedlund's brain dysfunction and destructive childhood to the crime: "[Hedlund's] sense of loyalty, poor decision making process due to brain dysfunction and passivity may have greatly influenced the outcome of his conviction and death sentence." (Weinstein Declaration at 18.)

The Ninth Circuit initially affirmed the district court's denial of Hedlund's habeas petition. *Hedlund v. Ryan*, 750 F.3d 793 (9th Cir. 2014). Subsequently, however, the court withdrew that opinion. *Hedlund v. Ryan*, 854 F.3d 557 (9th Cir. 2017). The court wrote that "the district court should have granted the petition with respect to Hedlund's sentence" due to the causal nexus error. *Id*. at 587. The court reversed the district court and remanded "with instructions to grant the writ with respect to Hedlund's sentence unless the state, within a reasonable period, either

corrects the constitutional error in his death sentence or vacates the sentence and imposes a lesser sentence consistent with law." *Hedlund*, 854 F.3d at 587–88. The court found that the causal nexus error was not harmless and, instead, had a "substantial and injurious" effect upon Hedlund's sentence. *Id.* (citation omitted). The District Court entered judgment granting the conditional writ. (Judgment of Dismissal in a Civil Case, *Hedlund v. Ryan*, No. CV-02-00110-PHX-DGC (D. Ariz. Jul. 3, 2017), ECF No. 158.)

### 6.    New Independent Review

The State filed a motion in the Arizona Supreme Court, requesting that rather than Hedlund receiving a new sentencing proceeding that complied with constitutional requirements, that the Arizona Supreme Court instead review the mitigating evidence on the cold appellate record and reweigh it against the sole remaining aggravating factor. (DA Doc. 15.) Despite Hedlund's opposition to this procedure, the Arizona Supreme Court granted the State's motion and conducted an independent review of the evidence, determining that based on the evidence, Hedlund warranted a sentence a death, and again imposed a sentence of death, without proceedings or a hearing in the trial court.[13] *State v. Hedlund*, 431 P.3d 181, 184, 191 (Ariz. 2018).

The Arizona Supreme Court did the same for Hedlund's brother and co-defendant. *See State v. McKinney*, 426 P.3d 1204, 1208 (Ariz. 2018), *cert. granted*, *McKinney v. Arizona*, 139 S. Ct. 2692 (2019) (mem.). The Questions Presented upon which certiorari was granted in *McKinney*, *see* Petition for a Writ of Certiorari, *McKinney v. Arizona*, No. 18-1109, at (i), pose nearly the same issues as those presented in *Hedlund*:

> 1.  Whether the correction of error under *Eddings v. Oklahoma*, 455 U.S. 104 (1982), requires resentencing, particularly where the error

---

[13] Although the Arizona Supreme Court does not impose sentence in the usual course, it did impose sentence here where Hedlund's existing death sentence was effectively vacated by the federal courts.

originated in the trial court, and the federal habeas court found that the error had a substantial and injurious effect on the death sentence.

2. Whether the Arizona Supreme Court was required to apply current law when weighing mitigating and aggravating evidence to determine whether a death sentence was warranted.

Petition for a Writ of Certiorari, *Hedlund v. Arizona*, No. 19-5247, at (i).

Hedlund filed his Petition for a Writ of Certiorari in the United States Supreme Court on July 17, 2019, and requested that the Court hold the petition in abeyance pending the decision in *McKinney*. *Hedlund*, Petition for a Writ of Certiorari at 2–3. Hedlund's petition remains pending.[14]

## III.   STATE COURT PRESUMPTION OF CORRECTNESS

Hedlund hereby challenges the presumption of correctness provided for by 28 U.S.C. § 2254(e)(1) that could, in different circumstances, attach to certain factual findings made by the state courts in his case. As detailed throughout this Petition—and as evidentiary development will further illustrate—such factual findings, to the extent any are found to exist, are not entitled to the presumption of correctness in § 2254(e)(1).

More specifically, Hedlund asserts that findings of fact made by the state courts at any point since legal proceedings began in this case—should any such findings exist—are not entitled to this Court's deference because those findings are not fairly supported by the record before the state courts. Hedlund further asserts that the presumption of correctness is inapplicable and inappropriate in this case for several additional reasons, including but not limited to (1) the state courts' fact-finding procedures were inadequate to afford his constitutional claims full and fair consideration; (2) material facts were not adequately developed in state-court proceedings; (3) he did not receive full, fair, and adequate hearings in state court; and (4) the state-court proceedings otherwise denied him due process of law.

---

[14] *McKinney* is set for oral argument on December 11, 2019.

## IV.   PROCEDURAL STATUS OF CLAIMS AND EXHAUSTION

Most of the federal constitutional claims alleged throughout this Petition have been exhausted in proceedings before Arizona courts. Some claims presented herein, however, were not fully presented in state court, were not ripe for review, or could only be adequately raised in this forum. Respondents bear the burden of demonstrating that Hedlund has failed to exhaust a particular claim. *See, e.g.*, *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938); *Esslinger v. Davis*, 44 F.3d 1515, 1528 (11th Cir. 1995); *Herbst v. Scott*, 42 F.3d 902, 905 (5th Cir. 1995); *Brown v. Maass*, 11 F.3d 914, 914 (9th Cir. 1993) (per curiam).

To the extent that any claim is deemed procedurally defaulted, and because the doctrine of procedural default is based upon comity rather than upon jurisdiction, this Court retains the power to consider the merits of that claim. *See, e.g.*, *Reed v. Ross*, 468 U.S. 1, 9 (1984). Further, this Court may review the merits of any procedurally defaulted claim because Hedlund can demonstrate both cause for any failure to properly exhaust a particular claim and prejudice from the alleged constitutional violation. Alternatively, Hedlund can demonstrate that a fundamental miscarriage of justice would result if this Court declines to hear any particular claim on the merits. *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991). And, to the extent that Respondents argue that any state-court decisions adverse to Hedlund were based upon state procedural grounds, those grounds were neither adequate to support the state court's judgments nor independent of federal constitutional guarantees. *See generally Stewart v. Smith*, 536 U.S. 856 (2002) (per curiam); *Ford v. Georgia*, 498 U.S. 411, 423–24 (1991).

As Hedlund will explain in his evidentiary-development requests, Rules 6 (discovery), 7 (expansion of the record), and 8 (evidentiary hearing) of the Rules Governing Section 2254 Cases in the United States District Courts require that federal courts provide a habeas petitioner with reasonable means to investigate and factually support the claims presented in a petition for a writ of habeas corpus. *See*

1   *McCleskey v. Zant*, 499 U.S. 467, 498 (1991).

2       Lastly, Hedlund respectfully reserves the right to timely request a limited stay

3 and abeyance pursuant to *Rhines v. Weber*, 544 U.S. 269 (2005), in order to return

4 to state court to present any unexhausted claims, should the need to do so become

5 apparent.

6 **V.    RIGHT TO AMEND**

7       Hedlund expressly reserves his right to amend this Petition, both as a matter

8 of course under Federal Rule of Civil Procedure 15(a)(1) and later, as necessary and

9 appropriate. *See* Rule 12, Rules Governing Section 2254 Cases in the United States

10 District Courts (applying Federal Rules of Civil Procedure to habeas proceedings).

11 In *McCleskey v. Zant*, the Supreme Court reaffirmed the "principle that [a]

12 petitioner must conduct a reasonable and diligent investigation aimed at including

13 all relevant claims and grounds for relief in the first federal habeas petition." 499

14 U.S. at 498. Hedlund believes that additional claims may be identified through

15 ongoing investigation, after discovery is conducted and completed, and/or after an

16 evidentiary hearing is held. At the appropriate time during these proceedings,

17 Hedlund will therefore present any additional claims through amendments or

18 supplements to this Petition.

19 **VI.    AEDPA IS UNCONSTITUTIONAL**

20       As an initial matter, the principle that every prisoner must have all of his

21 constitutional claims heard by a court is central to fundamental fairness and the

22 integrity of the justice system. *See Bounds v. Smith*, 430 U.S. 817, 822–23 (1977),

23 *abrogated on other grounds by Lewis v. Casey*, 518. U.S. 343 (1996). One essential

24 method of ensuring that a prisoner's constitutional claims are heard is through the

25 availability of the writ of habeas corpus. However, the passage of the Antiterrorism

26 and Effective Death Penalty Act of 1996 (AEDPA) substantially changed the law

27 that governs habeas petitions. *See Felker v. Turpin*, 518 U.S. 651, 654 (1996).

28 AEDPA's restrictions suspend the writ of habeas corpus and violate the separation

of powers, which results in prisoners remaining in prison without review of alleged constitutional defects of their convictions and sentences.

### A.    AEDPA unconstitutionally suspends the writ of habeas corpus.

Congress cannot define prisoners' rights so narrowly that it, in effect, suspends the writ of habeas corpus. The writ of habeas corpus is guaranteed by the United States Constitution in the Suspension Clause, which provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. I, § 9, cl. 2. The Suspension Clause is a structural limitation on the power of Congress. Like bills of attainder and ex post facto laws, which are also prohibited in Article I, section 9, the suspension of habeas (except in cases of rebellion or invasion) belongs to a "category of Congressional actions which the Constitution barred." *United States v. Lovett*, 328 U.S. 303, 315 (1946). The writ "can be preserved in practice no other way than through the medium of the courts of justice; whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void." *Id.* at 314 (quoting The Federalist No. 78 (Alexander Hamilton)).

AEDPA prevents federal courts in certain circumstances from granting relief when it is undisputed that a conviction or sentence is unconstitutional. *See* 28 U.S.C. § 2254. Under AEDPA, before granting the writ a federal court must determine whether, for example, the complete deprivation of a jury in a capital case is a "reasonable" or "unreasonable" constitutional violation. As explained long ago,

> habeas is "the most important human right" in the Constitution because it functions as a mechanism for the enforcement of the Bill of Rights against the federal government: "Censorship can be evaded; prosecutions against ideas may break down; a prison wall is there. Only habeas corpus can penetrate it. When imprisonment is possible without explanation or redress, every form of liberty is impaired."

Dan Poulson, Note, *Suspension for Beginners: Ex parte Bollman and the Unconstitutionality of the 1996 Antiterrorism and Effective Death Penalty Act*, 35

Hastings Const. L. Q. 373, 399 (2008) (quoting Zechariah Chafee, Jr., How Human Rights Got Into the Constitution 53 (1952)). This restriction on federal courts' ability to grant relief constitutes an unconstitutional suspension of the writ.

### B.   AEDPA violates the separation-of-powers doctrine.

Congress cannot impinge on the courts' duty to say what the law is, but Congress does so when it requires Article III courts to ignore any part of the Constitution and to instead give effect to a contrary law. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178 (1803). Congress has the power to constrain courts' authority. *See Keene Corp. v. United States*, 508 U.S. 200, 207 (1993); *see also* U.S. Const. art. III, § 1 ("The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."). However, there are limits on that power. One such limit is that Congress must not manipulate the "test for determining the scope of [habeas corpus]" because the writ "is designed to restrain" Congress, and because the writ is "an indispensable mechanism for monitoring the separation of powers." *Boumediene v. Bush*, 553 U.S. 723, 765–66 (2008).

The separation-of-powers doctrine found in Article III "serves both to protect the role of the independent judiciary within the constitutional scheme of tripartite government . . . and to safeguard litigants' right to have claims decided before judges who are free from potential domination by other branches of government." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 848 (1986) (citations and internal quotation marks omitted). When confronted with an unconstitutional provision, the Supreme Court in *Marbury* considered whether courts are bound by "an act of the legislature" that is "repugnant to the constitution." The Court concluded, "It is emphatically the province and duty of the judicial department to say what the law is." 5 U.S. at 177.

"[I]f Congress does provide for habeas in the federal courts, Congress cannot . . . instruct the federal courts, whether acting in a federal or in a state case, how to

think, how to ascertain the law, how to judge." *Irons v. Carey*, 505 F.3d 846, 855 (9th Cir. 2007) (Noonan, J., concurring), *overruled on other grounds by Hayward v. Marshall*, 603 F.3d 546 (9th Cir. 2010) (en banc). AEDPA infringes upon the power of the courts to say what the law is and to give effect to that law and thereby violates the separation-of-powers doctrine.

### C.   Conclusion

AEDPA unconstitutionally suspends the writ of habeas corpus and violates the separation-of-powers doctrine because it dictates that courts must not "grant relief to citizens who are being held in prison in violation of their constitutional rights unless the constitutional error that led to their unlawful conviction or sentence is one that could not have been made by a reasonable jurist." *Id*. at 859 (Reinhardt, J., concurring specially). Also, AEDPA does not allow an appellate judge to correct an unlawful detention if a lower court's "error is understandable," which is inconsistent with a judge's duty "to enforce the laws and protect the rights of our citizens against arbitrary state action." *Id.* "Whether it was reasonable for a state court to misapprehend the dictates of the Constitution in a particular case hardly seems relevant to a citizen's right not to be imprisoned in violation of the fundamental liberties he is granted by the document that governs our societal structure." *Id.* As AEDPA is unconstitutional, this Court should not be constrained by its dictates.

### CLAIM ONE

**Hedlund's constitutional rights were violated by the Arizona Supreme Court when it purported to cure the constitutional violation in Hedlund's case by conducting an independent review, instead of allowing a sentencing hearing before a jury.**

The Arizona Supreme Court violated Hedlund's rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution when it intervened to reinstate his death sentence rather than allowing him a sentencing hearing before a jury, in its 2018 decision. *See State v. Hedlund*, 431 P.3d 181 (Ariz.

2018). Hedlund incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

### A. Procedural posture

This claim was raised before the Arizona Supreme Court (DA Doc. 21, DA Doc. 29, DA Doc. 31 at 61–62, DA Doc. 54 at 1–3) and denied on the merits (DA Doc. 23); *Hedlund*, 431 P.3d at 183–84. The Arizona Supreme Court's decision was contrary to clearly established federal law, as discussed below. *See* 28 U.S.C. § 2254(d)(1).

As a preliminary matter, at the time of filing this Petition, Hedlund's petition for writ of certiorari, which raises the issues addressed in this claim, remains pending in the United States Supreme Court. *See Hedlund v. Arizona*, No. 19-5247. Hedlund's certiorari petition presents the same questions as the petition for which certiorari was granted on June 10, 2019, in his brother and co-defendant James McKinney's case, *McKinney v. Arizona*, No. 18-1109. Oral argument is scheduled in *McKinney* for December 11, 2019. In his petition and in his reply brief in support of certiorari, Hedlund asked the Supreme Court to hold his petition pending resolution of *McKinney*. The State of Arizona has agreed with this request. (Resp't's Br. in Opp'n to Pet. for Cert. at 1, *Hedlund v. Arizona* (No. 19-5247). Hedlund asserts this claim in order to preserve his rights, and will seek to amend his petition upon conclusion of those proceedings. At present, the Supreme Court has not acted on Hedlund's hold request, so, out of an abundance of caution, he asserts this claim to preserve his rights and may seek to amend his petition upon conclusion of those proceedings.

### B. Hedlund is entitled to have a jury determine his sentence.

#### 1. Hedlund's conviction is not final.

The Ninth Circuit found that the Arizona Supreme Court unconstitutionally barred mitigation evidence lacking a causal connection to the crime from being given effect to with respect to the propriety of imposing a life sentence in Hedlund's

1   case, in violation of *Lockett v. Ohio*, 438 U.S. 586 (1978) (plurality opinion),

2   *Eddings v. Oklahoma*, 455 U.S. 104 (1982), and their progeny. *Hedlund v. Ryan*,

3   854 F.3d 557, 563 (9th Cir. 2017). The court held that this error, called a "causal

4   nexus error," was not harmless and, instead, had a "substantial and injurious" effect

5   on Hedlund's sentence. *Id.* at 587. After remand, the district court entered judgment,

6   issuing a conditional writ of habeas corpus and ordering the State to either impose

7   a lesser sentence or correct the constitutional error in Hedlund's death sentence.

8   (Judgment of Dismissal in a Civil Case, *Hedlund v. Ryan*, No. CV-02-00110-PHX-

9   DGC (D. Ariz. Jul. 3, 2017), ECF No. 158.)

10          Habeas petitioners challenge the validity of the judgments authorizing their

11   confinement or sentence. In *Magwood v. Patterson*, 561 U.S. 320 (2010), the

12   Supreme Court found that the grant of a conditional writ of habeas corpus

13   essentially invalidated the underlying judgment and allowed "the State [to] seek a

14   *new* judgment (through a new trial or a new sentencing proceeding)." *Id.* at 332

15   (quoting *Wilkinson v. Dotson*, 544 U.S. 74, 83 (2005)). *Magwood* makes clear that

16   because the federal court granted a conditional writ, Hedlund's state judgment is no

17   longer final, thereby entitling him all of the rights that a person with a non-final

18   judgment would receive. The failure to apply new rules of constitutional law to

19   cases pending on direct review violates the Constitution. *Griffith v. Kentucky*, 479

20   U.S. 314, 322 (1987).

21          Once the writ issued, Hedlund's prior death sentence was no longer final and

22   the state supreme court was required to follow current constitutional law. *See*

23   *Jimenez v. Quarterman*, 555 U.S. 113, 120 (2009) (once a state court reopens direct

24   review, a formerly-final conviction is no longer final under AEDPA); *see also*

25   *Magwood*, 561 U.S. at 332. A criminal conviction is not final until the sentence is

26   final. *See Burton v. Stewart*, 549 U.S. 147, 156 (2007) (per curiam). Thus, even if

27   Hedlund's conviction was final before the habeas writ was granted, it was no longer

28   final when the state supreme court reopened independent review to weigh evidence

1  to determine whether a death sentence was warranted.[15]

2  Although Hedlund was not given the benefit of the protections afforded, for

3  example, in *Hurst v. Florida*, 136 S. Ct. 616 (2016) and *Ring v. Arizona*, 536 U.S.

4  584 (2002), when his case was final and pending in habeas, he must have been

5  afforded those constitutional requirements after his sentence was no longer final

6  following the grant of the writ. In Arizona, independent review can only occur on

7  direct appeal.[16]

8  _____

9  [15] Though Hedlund asserts that the Arizona Supreme Court's independent review
   was a new sentencing or a new direct appellate review, regardless of the type of
10 review, the conditional habeas grant and the state supreme court's new judgment
   rendered Hedlund's conviction non-final. Further, if the independent review
11 occurred outside of direct appellate review, then it injected arbitrariness into
   Hedlund's death sentence and deprived him of due process by acting outside of the
12 established process, in violation of the Eighth and Fourteenth Amendments.
   Especially in a capital case, the defendant "has a substantial and legitimate
13 expectation that he will be deprived of his liberty" only after the state has followed
   its own statutory guidelines establishing the mandatory protections necessary to
14 preserve a defendant's rights. *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980). The
15 death penalty is only constitutional where states have a procedure for inflicting
   death and follow this procedure, removing the risk that death will be imposed in an
16 arbitrary and capricious manner. *Gregg v. Georgia*, 428 U.S. 153, 188 (1976) (joint
   opinion of Stewart, Powell, and Stevens, JJ.) (citing *Furman v. Georgia*, 408 U.S.
17 238, 309–10 (1972) (Stewart, J., concurring)). The system must function in "a
18 consistent and a rational manner." *Id.* at 189 (citation omitted).

19 [16] The Arizona Supreme Court asserted in its decision that Hedlund's case remained
20 final. *See Hedlund*, 431 P.3d at 184. Whether a state court has reopened direct
   review depends on the character—not the label—of the proceedings. When it comes
21 to finality, "[t]he designation given the judgment by state practice is not
22 controlling." *Richfield Oil Corp. v. State Bd. of Equalization*, 329 U.S. 69, 72
   (1946); *see also Dep't of Banking of Neb. v. Pink*, 317 U.S. 264, 268 (1942) (per
23 curiam) (similar). Instead, courts should "look to how a state procedure functions."
24 *Carey v. Saffold*, 536 U.S. 214, 223 (2002). The Supreme Court has noted that what
   a state calls post-conviction proceeding could be "in fact part of direct review"
25 where it *functions* as one. *Wall v. Kholi*, 562 U.S. 545, 555 n.3 (2011). Determining
26 whether a defendant's mitigation is sufficiently substantial to warrant leniency—
   and thus the appropriate sentence to be imposed on him—is not a question that
27 would arise in collateral post-conviction proceedings, rather, it is a question that
28 arises when a case is not final. Sentencing is not a question for collateral

The United States Supreme Court has held that the "selective application of new rules violates the principle of treating similarly situated defendants the same." *Griffith*, 479 U.S. at 323. The Arizona Supreme Court has taken this approach in many other cases that were once final on direct review, then had their finality disturbed in federal habeas proceedings. *See, e.g.*, *State v. Wallace*, 191 P.3d 164, 166 (Ariz. 2008) (jury sentencing after judge-sentenced petitioner granted federal habeas relief on other grounds); *State v. Smith*, 159 P.3d 531, 536 (Ariz. 2007) (same). In both *Wallace* and *Smith*, the defendants had been sentenced to death by a judge but were afforded a jury sentencing after being granted federal habeas relief for a non-*Ring* claim related to a penalty-phase constitutional failure. In those cases, the sentences had become final following original direct review, certiorari proceedings, and the issuance of a mandate. But the finality of both cases was disturbed by the grant of a conditional writ, and *Ring* then applied.

The Arizona Supreme Court appeared to ignore that cases that were once final on direct review can become no longer final. For example, in addition to the cases above where relief was granted in federal court, Arizona courts have instituted jury resentencing for defendants whose cases were final on direct review pre-*Ring*, but then had their finality disturbed by state post-conviction proceedings. *See, e.g.*, *State v. Kiles*, 213 P.3d 174 (Ariz. 2009) (defendant originally sentenced to death by judge for 1989 crime, but resentenced by jury after *Ring*).

In *Thompson v. Lea*, 681 F.3d 1093 (9th Cir. 2012), the court examined finality where the conviction originally became final ninety days after the California Supreme Court denied discretionary review on direct appeal. However, in denying review, the state supreme court noted that the petitioner could seek any relief available after the United States Supreme Court issued an opinion in a specific pending case. After that opinion came out, the petitioner sought relief. Though the

---

proceedings, but is "part of the criminal case." *Mitchell v. United States*, 526 U.S. 314, 328 (1999).

1  state supreme court dismissed review on the merits, the Ninth Circuit held that, in
2  doing so, the state supreme court reopened direct review and made Thompson's
3  conviction "again capable of modification through direct appeal." *Id*. at 1094
4  (internal quotation and citation omitted). Given the minimal action by the state
5  supreme court in *Thompson*, which was enough to reopen the case, the far more
6  extensive action by the Arizona Supreme Court, by redoing independent review,
7  does as well. In *Thompson*, the state court merely left open the possibility that it
8  could consider the case again. Here, the Arizona Supreme Court assessed the
9  evidence to decide whether Hedlund should get the death penalty.

10        Similarly, in *Jimenez*, 555 U.S. 113, the state court granted the defendant the
11  right to file a late direct appeal during state collateral review. The Court noted that
12  his judgment was not final until the conclusion of that appeal or the expiration of
13  the time to seek certiorari. Once the state court reopened direct review, the
14  conviction was no longer final. *Id*. at 119–20. Until the availability of direct appeal
15  and certiorari to the Supreme Court ends, the process of direct review has not come
16  to an end and a presumption of finality does not attach. *Id*. Once the conditional
17  writ issued, a death sentence could not be imposed without further action in state
18  court. Only after a new judgment could Hedlund again face the death penalty.

19        Once the Arizona Supreme Court re-opened independent review, it did not
20  matter how the state court characterized the new proceeding. Hedlund's case was
21  no longer final. This is demonstrated by the practical effect of the writ: had the state
22  court not taken action to impose a new sentence, Hedlund's death sentence could
23  not be carried out. The conditional federal habeas corpus writ permitted the state
24  court an opportunity to correct a constitutional error. This does not diminish the fact
25  that a constitutional error was committed and as a result, the death sentence, as it
26  existed before, could not stand without a new judgment. Hedlund's death sentence
27  was no longer final after his return to state court. He was entitled to all of the
28  Constitution's guarantees.

2.    **Hedlund is constitutionally entitled to a jury determination of the facts necessary to support a death sentence under *Ring* and *Hurst*.**

Because his case is no longer final, Hedlund is entitled to the same protections as any other capital defendant who is not beyond direct review or whose case is otherwise not final, including a jury determination of the facts necessary to support a death sentence. As the U.S. Supreme Court has explained, the "failure to apply a newly declared constitutional rule to criminal cases pending on direct review violates basic norms of constitutional adjudication." *Griffith*, 479 U.S. at 322.

The United States Supreme Court held in 2002 that the Sixth Amendment right to a jury trial mandates that capital defendants are "entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Ring*, 536 U.S. at 589. Thus, since 2002, all defendants sentenced to death in Arizona *must* have a jury, not a judge, determine the sentence. The Supreme Court has explicitly held that for a judge to make this determination denies a capital defendant the right to a jury trial and is unconstitutional. *Id.* Hedlund was entitled to *Ring*'s application once his case was returned to the state court for a new judgment (the state also had the option of imposing a lesser sentence).

In *Murdaugh v. Ryan*, 724 F.3d 1104 (9th Cir. 2013), the Ninth Circuit explained that under the Arizona death penalty statute, a sentence of death cannot be imposed based on a statutory aggravating circumstance alone. *Id.* at 1115–16. The other constitutional element for death qualification is that the aggravating circumstances not be outweighed by one or more mitigating factors. *Id.* at 1115. That is, a person can only be sentenced to death if (1) one or more aggravating factors exist, and (2) the aggravation is not outweighed by mitigation. The *Murdaugh* Court held that *Ring* and the Sixth Amendment should not be read so

1   narrowly as to only require a finding of aggravating factors; it is also the weighing
2   decision which requires a jury. *Id*.

3       The United States Supreme Court has held the Sixth Amendment requires
4   that a jury, not a judge, make *all* the findings supporting a death sentence. *See Hurst*,
5   136 S. Ct. at 624. The Court in *Hurst* invalidated Florida's capital sentencing
6   scheme, which allowed a jury to make a recommendation as to the sentence during
7   the penalty phase, but left the ultimate determination as to the sentence to the judge.
8   *Id.* at 619. The Court held that under *Apprendi v. New Jersey*, 530 U.S. 466 (2000),
9   and *Ring*, such a scheme violated a capital defendant's Sixth Amendment right to a
10  jury trial. 136 S. Ct. at 621–22. In its analysis, the Court recognized that the weight
11  to be accorded to aggravating and mitigating circumstances, is a finding of fact that
12  must be decided by a jury. *Id.*

13      Therefore, in light of *Hurst*, there is no sound basis to treat the weighing of
14  aggravating and mitigating circumstances outside of *Apprendi*'s scope. Like
15  Florida, Arizona is a weighing state with a similar statute. Pursuant to *Hurst*, a jury,
16  not the Arizona Supreme Court, must make the weighing determination in
17  Hedlund's case to comply with the Sixth Amendment. No sentencer has ever done
18  so for Hedlund.

19      The State of Florida, in *Hurst*, argued that the weighing process fell outside
20  the ambit of *Ring* and *Apprendi* because the finding of an aggravating circumstance
21  made the defendant death-eligible, an argument the Supreme Court rejected. *Id.* at
22  622. In the wake of *Hurst*, the Florida Supreme Court agreed that it is not simply
23  the existence of aggravating factors that must be found by a jury, it is also the
24  weighing process which requires a jury. *See Hurst v. State*, 202 So. 3d 40, 53 (Fla.
25  2016) (per curiam) ("Thus, before a sentence of death may be considered by a trial
26  court in Florida, the jury must find the existence of the aggravating factors proven
27  beyond a reasonable doubt, that the aggravating factors are sufficient to impose
28  death, and that the aggravating factors outweigh the mitigating circumstances.").

*See also Rauf v. State*, 145 A.3d 430, 434 (Del. 2016) (per curiam of Strine, Holland, and Seitz, JJ.) (requiring that a jury, not a sentencing judge, find that the aggravating circumstances outweigh the mitigating circumstances and make that finding unanimously and beyond a reasonable doubt).

*Hurst* makes clear that *Clemons v. Mississippi*, 494 U.S. 738 (1990), which permitted appellate reweighing in some circumstances after an aggravator was found invalid, is no longer good law.[17] *Clemons* upheld appellate reweighing rather than resentencing after an aggravating factor was struck on appeal. *Id.* at 741. It did so by relying on *Hildwin v. Florida*, 490 U.S. 638 (1989) (per curiam) and *Spaziano v. Florida*, 468 U.S. 447 (1984), both of which were explicitly overruled by *Hurst*. *Id.* at 746. *Hildwin* held that the Sixth Amendment does not require a jury finding on aggravating circumstances. 490 U.S. at 640. *Spaziano* held that neither the Sixth nor the Eighth Amendments mandate the right to have a jury determine whether a capital sentence is appropriate. 468 U.S. at 457–59. Relying on these two cases together, *Clemons* held that because a jury was unnecessary for the findings supporting the death sentence, there was no constitutional reason an appellate court could not reweigh the facts supporting a death sentence after that death sentence was found to be infirm. 494 U.S. at 746–49.

The invalidity of *Clemons* is clear in light of *Hurst*. In *Hurst*, the Court expressly overruled *Spaziano* and *Hildwin* because "[t]ime and subsequent cases have washed away the logic" of those holdings. 136 S. Ct. at 624. Again, echoing *Ring*, *Hurst* reiterated that it is juries, not judges, who must make *all* the findings supporting a death sentence. *Id.*

If the Arizona Supreme Court's new independent review is the method to "cure" the constitutional error in Hedlund's sentence, then the court's decision

---

[17] Further, *Clemons* only permitted reweighing when there was an error with respect to consideration of an invalid aggravating factor, not where mitigation evidence was excluded. Considering an invalid aggravating circumstance in error is different from erroneously excluding relevant mitigating evidence.

alone is what increases Hedlund's maximum punishment to death. This violates the Sixth Amendment. If there was any doubt about the scope of *Ring*, *Hurst* has resolved it by explicitly overruling the two cases upon which *Clemons* rests, and the remedy set forth in *Clemons* is not viable. In light of *Ring* and *Hurst*, appellate reweighing is never constitutional where the question before the court involves weighing aggravating and mitigating circumstances.

Hedlund is entitled to a new sentencing hearing before a jury.[18] The Arizona Supreme Court, in reopening direct review, disturbed the finality of Hedlund's sentence to determine the appropriate sentence for him by weighing mitigating evidence against aggravation. Further, the court was not permitted under current

---

[18] Alternatively, Hedlund submits that *Hurst* is a "watershed procedural rule" because a jury's determination that aggravation outweighs mitigation beyond a reasonable doubt "implicat[es] the fundamental fairness and accuracy" of a death verdict. *Schriro v. Summerlin*, 542 U.S. 348, 352 (2004) (citation omitted). Put differently, where the rule announced in *Hurst* is not applied, as happened in Hedlund's case, "the likelihood of an accurate [death sentence] is seriously diminished." *Id*. The burden of proof requirement that *Hurst* imposed upon a capital jury's weighing determination is plainly a watershed procedural rule, when viewed in light of the Supreme Court's burden of proof jurisprudence. If *Hurst* did not simply clarify existing precedent, and instead created a new rule of constitutional law, *Hurst* made its ruling retroactive to cases on collateral review. "[C]ourts must give retroactive effect to new substantive rules of constitutional law." *Montgomery v. Louisiana*, 136 S. Ct. 718, 728 (2018). "Substantive rules," the Court stated, "include . . . rules prohibiting a certain category of punishment for a class of defendants because of their status or offense." *Id*. (quoting *Penry v. Lynaugh*, 492 U.S. 302, 330 (1989)). *Hurst* is such a rule. This is because *Hurst* prohibited a category of punishment—the death penalty—for an entire class of defendants— those made eligible for the death penalty—unless the State proves that aggravation outweighs mitigation beyond a reasonable doubt. *Hurst*, 136 S. Ct. at 622. *Hurst* is substantive in another respect: it imposes a new burden on the state whenever it seeks death sentences and places that most extreme punishment beyond its power to impose unless this weighty burden is surmounted. *See Summerlin*, 542 U.S. at 351–52 (describing "substantive" rules as those that put particular punishments beyond the power of the state to impose). And finally, *Hurst* narrowed the scope of Arizona's capital sentencing statute—which does not impose any standard of proof on a capital jury's weighing determination—by making it more difficult for juries to return death verdicts. *See Summerlin*, 542 U.S. at 351.

law to rely on aggravating evidence found by a judge as part of its sentencing calculus, or to conduct this analysis in place of the jury. *See* A.R.S. § 13-755(A)–(B); *Ring*, 536 U.S. at 589; *Hurst*, 136 S. Ct. at 624; *see also Hedlund*, 431 P.3d at 184. Because it could not sentence Hedlund to death without acting unconstitutionally and in violation of Arizona law, the Arizona Supreme Court had to allow his case to have a hearing before a jury.

C.     **The causal nexus error identified by the federal court could only be corrected by a new hearing, where a sentencer could review evidence and evaluate its weight firsthand.**

Hedlund seeks only that which the Constitution requires for every individual facing the death penalty: one opportunity to present mitigation evidence and have the sentencer fully consider and weigh it against aggravating evidence, without limitation or barrier to it being able to give effect to a life sentence. *See Eddings*, 455 U.S. at 113. The sentencer must also hear the aggravation evidence at a hearing, and weigh its strength against the mitigation. If Hedlund is not afforded this opportunity, his death sentence cannot stand. *See, e.g.*, *id*. at 112 (explaining that consideration of offender's life history is a "constitutionally indispensable part of the process of inflicting the penalty of death").

The Arizona Supreme Court violated Hedlund's Sixth, Eighth, and Fourteenth Amendment rights by arbitrarily intervening in the process and refusing to allow Hedlund resentencing in the trial court after a federal court found that his death sentence violated *Eddings*, 455 U.S. 104, and *Lockett*, 438 U.S. 586. The Arizona Supreme Court violated *Eddings*, and further, injected arbitrariness into Hedlund's sentence, in violation of the Eighth and Fourteenth Amendments, by creating a remedy outside of the established capital-punishment scheme.

Multiple courts have found that resentencing is the remedy to correct an *Eddings* error. The causal nexus error in this case resulted in an unconstitutional death sentence that can only be cured by the involvement of the jury, as the arbiter of society's reasoned moral response. Supreme Court cases "following *Lockett* have

1   made clear that when the [fact-finder] is not permitted to give meaningful effect or
2   a 'reasoned moral response' to a defendant's mitigating evidence—because it is
3   forbidden from doing so by statute or a judicial interpretation of a statute—the
4   sentencing process is fatally flawed." *Abdul-Kabir v. Quarterman*, 550 U.S. 233,
5   264 (2007) (examining the Texas equivalent of Arizona's causal nexus error).

6       Hedlund, whose rights were found to have been substantially and
7   prejudicially affected, is entitled to a sentencing hearing where a sentencer hears
8   his mitigation evidence firsthand, judges its credibility, determines its weight, and
9   weighs it against the aggravating factor evidence (which it also must hear firsthand
10  to determine its weight), without being constricted by the causal nexus test. *See*
11  *Tennard*, 542 U.S. at 278 (it is not enough that the fact-finder be able to "consider"
12  the mitigation, there must be no barriers in place to prevent the mitigation from
13  being given effect). The United States Supreme Court in *Lockett*, 438 U.S. at 604,
14  and *Eddings*, 455 U.S. at 112, held that the Constitution requires the "sentencer"
15  not be precluded from considering all mitigating evidence. No sentencer has ever
16  had the opportunity to hear, consider, and weigh all of Hedlund's mitigating
17  evidence without unconstitutional limitations. Hedlund has never had the chance to
18  present any and all available mitigation evidence, without the knowledge that the
19  court will impose a causal nexus test. The Arizona Supreme Court, in its
20  independent review, deemed that the aggravator was "established," *Hedlund*, 431
21  P.3d at 184, and relied on the findings of the trial court, and of the 1996 independent
22  review (deemed unconstitutional and to have had a substantial and injurious effect
23  on Hedlund's sentence). *Id.* at 185.

24      Further, the United States Supreme Court has found repeatedly that a new
25  sentencing hearing is required to correct an *Eddings* error. *See, e.g.*, *Skipper v. South*
26  *Carolina*, 476 U.S. 1, 8 (1986) (finding a death sentence could not stand after an
27  *Eddings* error, though the State was "not precluded from again seeking to impose
28  the death sentence, provided that it does so through a new sentencing hearing at

1   which petitioner is permitted to present any and all relevant mitigating evidence
2   that is available"); *see also Hitchcock v. Dugger*, 481 U.S. 393, 398–99 (1987)
3   (finding *Eddings* error and noting that the State could seek to impose death again
4   through a "new sentencing hearing at which petitioner is permitted to present any
5   and all relevant mitigating evidence that is available"); *Mills v. Maryland*, 486 U.S.
6   367, 375 (1988) (holding "it is our duty to remand this case for resentencing" after
7   finding that the sentencer violated *Eddings*). In *Penry v. Lynaugh*, 492 U.S. 302,
8   328 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002),
9   the Court wrote that the "reasoning in *Lockett* and *Eddings* thus compels a remand
10  for resentencing so that we do not risk that the death penalty will be imposed in
11  spite of factors which may call for a less severe penalty." (internal quotation and
12  citations omitted).

13      Other courts, when faced with causal nexus or similar *Eddings* error, have
14  determined that a new sentencing hearing is the appropriate remedy. *Cole v. Dretke*,
15  265 F. App'x 380 (5th Cir. 2008) (remanding for granting of writ and resentencing,
16  not additional appellate review, after the Supreme Court reversed the appellate
17  findings on causal nexus error in *Abdul-Kabir*, 550 U.S. 233); *Ex parte Smith*, No.
18  AP-74,228, 2007 WL 1839892 (Tex. Crim. App. June 17, 2007) (remanding for
19  new sentencing trial after Supreme Court found error in the appellate review of the
20  causal nexus issue in *Smith v. Texas*, 550 U.S. 297 (2007)); *State v. Roberts*, 998
21  N.E.2d 1100, 1115 (Ohio 2013) (remanding for resentencing rather than new state
22  supreme court independent review after finding *Eddings* error).

23      The Constitution requires a resentencing hearing in the trial court for the very
24  reasons there is a right to trial and right to a jury. Trial courts have "an institutional
25  advantage over appellate courts" in making sentencing decisions. *Rita v. United
26  States*, 551 U.S. 338, 363 (2007) (quoting *Koon v. United States*, 518 U.S. 81, 98
27  (1996)). The emotional power of Hedlund's mitigation evidence when presented in
28  the form of live testimony—which the trial judge noted moved him to feel

compassion for Hedlund—cannot be fairly judged on a cold, paper record. (Tr. 7/30/1993 at 25 ("I don't think anyone could listen to the evidence presented by your sisters without feeling a great deal of anguish and compassion for the kind of existence that you lived as a small child.").) The Arizona Supreme Court could not properly assess the credibility of lay and expert witnesses on a paper record—and on a record from a time where Arizona law unconstitutionally forbade mitigation evidence from giving effect to a life sentence where it lacked a causal connection.[19]

The same is true of expert psychological and medical testimony pertaining to the lifelong effects of child abuse, and resulting substance addiction and brain impairment.[20] It is the role of the trial court or jury to hear mitigation testimony

---

[19] The need for a hearing was demonstrated by the Arizona Supreme Court's determinations regarding the credibility of witness testimony without seeing those witnesses firsthand. *See, e.g.*, *Hedlund*, 431 P.3d at 186 ("Based on our independent analysis, we conclude, as did the trial court, that the expert testimony had little credibility or probative value.") It was also improper, and demonstrated the need to remand for a sentencing hearing, for the court to fill in potential facts where the actual answer to a disputed fact was lacking. With respect to the plea agreement, the court seemingly found no evidence in the record explaining why it was offered, so instead determined the plea warranted little mitigating weight because plea offers "can be made for reasons that have nothing to do with whether a prosecutor believes the defendant deserves the death penalty." *Id.* at 189. Further, the court referred to the second plea agreement as a "purported" plea agreement, and noted that nothing in the record indicated that the judge would have accepted it. *Id.* These are all disputed facts and questions that could have been addressed at a hearing. It was unconstitutional to sentence Hedlund to death based on disputed facts and open questions, particularly where a hearing could have attempted to answer these questions.

[20] Further, by refusing to remand for a hearing, the Arizona Supreme Court ignored decades of scientific advancement regarding the understanding of lifelong effects of child abuse and neglect, post-traumatic stress disorder, and brain impairment. Under Arizona law, Hedlund is entitled to seek introduction of this mitigating evidence at a resentencing hearing. *See, e.g.*, S*tate v. Bocharski*, 189 P.3d 403, 418 (Ariz. 2008) (approving trial court's decision to allow new mitigating evidence at capital resentencing); *see also State v. Kiles*, 213 P.3d 174, 189–91 (Ariz. 2009) (considering mitigation evidence presented to jury during new sentencing hearing, including updated science, after original 1990 sentence was vacated).

firsthand, make fact-findings, and determine its credibility and strength, then weigh that against the strength of the aggravating evidence, which it must also hear and weigh firsthand. No court has constitutionally done so for Hedlund. Hearings serve a different purpose than a proceeding based on legal briefs. It is unconstitutional for Hedlund to be sentenced to death based on an on-paper, independent review of a trial court decision infected with legal error. *See Madison v. Alabama*, 139 S. Ct. 718, 731 (2019) (holding that state courts "may not rely on any arguments or evidence tainted" by legal error when determining whether a death sentence is warranted).

> **D.** **The Arizona Supreme Court's determination that an independent review was the appropriate remedy was contrary to, and an unreasonable application of, clearly established federal law.**

The state court decision to engage merely in a new independent review was an unreasonable application of, or contrary to, clearly established federal law, *see* 28 U.S.C. § 2254(d)(1). Accordingly, § 2254(d) places no limitation on relief, and this Court should review the claim de novo.

In holding that independent review was an appropriate remedy for the identified *Eddings* error (instead of permitting a hearing), and that it could impose a death sentence on Hedlund without a jury, where a jury has never found the requisite underlying facts, the Arizona Supreme Court acted contrary to clearly established federal law, as determined by the United States Supreme Court, as discussed above. *See Hurst*, 136 S. Ct. 616; *Ring*, 536 U.S. 584; *Apprendi*, 530 U.S. 466.

Further, the court acted contrary to clearly established law as determined by the United States Supreme Court in finding that Hedlund's sentence was final after its initial independent review, and had not been reopened. *See, e.g.*, *Magwood*, 561 U.S. at 332 (finding that the grant of a conditional writ of habeas corpus essentially invalidated the underlying judgment and allowed the State to seek "a new judgment (through a new trial or a new sentencing proceeding)"); *Jimenez*, 555 U.S. at 120.

1    The court acted contrary to clearly established federal law in finding that
2    even after the conditional grant of the writ of habeas corpus and the court's
3    reopening of sentencing through an independent review, Hedlund's judgment
4    remained final, because without a sentence, a conviction cannot be final because
5    "[t]he sentence is the judgment." *Burton*, 549 U.S. at 156 (per curiam) (internal
6    quotation marks omitted).

7    Failing to apply contemporary rules of constitutional law to Hedlund, though
8    his case was pending on direct review, and selectively applying a new rule in
9    violation of the principle of treating similarly-situated defendants the same, were
10   contrary to *Griffith*, 479 U.S. at 322–23.

11   If the court acted outside of its established procedures for imposing a death
12   sentence, and undertook a proceeding that, in the view of the Arizona Supreme
13   Court, was not a sentencing or a direct appeal, the court acted contrary to federal
14   law clearly established by, for example, *Hicks*, 447 U.S. at 346; *Gregg*, 428 U.S. at
15   188; and *Furman*, 408 U.S. at 309–10 (Stewart, J., concurring).

16   In finding that this sentencing proceeding was occurring after finality, in
17   seemingly some sort of post-conviction collateral proceeding, the state court acted
18   contrary to clearly established federal law that sentencing is not a question for
19   collateral proceedings, but is "part of the criminal case." *Mitchell*, 526 U.S. at 328.

20   **E.    Conclusion**

21   The Arizona Supreme Court violated Hedlund's right to a jury, his right to
22   be free from cruel and unusual punishment, and his right to due process by asserting
23   that it could cure the established *Eddings* error by conducting a new independent
24   review, which it seemingly asserted existed outside of the established procedures
25   for capital punishment sentencing. The court violated Hedlund's constitutional
26   rights by determining that his conviction remained final, despite the conditional
27   grant of the writ, and despite its reopening of his case to reweigh mitigation and
28   impose a sentence, and thus refusing to apply today's constitutional mandates. The

court further violated Hedlund's right to be tried by a jury by refusing to permit him to present evidence in a trial court and by sentencing him to death instead of requiring that it be done by a jury.

Hedlund seeks what the Constitution promises every defendant facing the death penalty: the opportunity to present all relevant mitigating evidence in a hearing without limitation, to have that evidence considered and given effect to, by the sentencer, *see Penry I*, 492 U.S. at 328, and, to have his death sentence imposed in a manner that comports with contemporary constitutional protections. A death penalty imposed without these protections is unconstitutional, and cannot stand. Hedlund's sentence is constitutionally infirm, and he is entitled to relief.

## CLAIM TWO

**The Arizona Supreme Court unconstitutionally barred mitigation evidence from being given effect where it did not have a causal connection to Hedlund's crime.**

Hedlund's death sentence violates the Eighth and Fourteenth Amendments to the United States Constitution because the Arizona Supreme Court, in its decision imposing death, prohibited evidence that was not causally connected to the crime from being "give[n] effect to," as required by *Tennard v. Dretke*, 542 U.S. 274, 285 (2004). *See also Lockett v. Ohio*, 438 U.S. 586 (1978); *Eddings v. Oklahoma*, 455 U.S. 104 (1982). This had a "substantial and injurious effect or influence" on Hedlund's sentence, and thus caused actual prejudice, warranting relief. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Hedlund hereby incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

### A.    Procedural posture

The Arizona Supreme Court considered and ruled on the merits of this claim. Further, Hedlund raised this issue in his motion for reconsideration in the Arizona Supreme Court (DA Doc. 54 at 4–8), which the court denied (DA Doc. 57). The Arizona Supreme Court's decision was contrary to "clearly established Federal law, as determined by the Supreme Court of the United States," as discussed below.

*See* 28 U.S.C. § 2254(d)(1). Further, it was an unreasonable determination of the facts based on the state-court record. *See id*. at § 2254(d)(2).

In the alternative, if this Court finds that this claim was not raised in state court, this is because it previously was not available or ripe for review, and there is an absence of state corrective process that would effectively protect Hedlund's rights. *See* 28 U.S.C. § 2254(b)(1)(B). Because this claim challenges adjudications by the highest court of Arizona, it is not possible to challenge these determinations in Arizona state courts, and any effort to do so would be futile. *See id*. Thus, there is no available forum to exhaust this claim. If this Court finds that this claim has not been adjudicated by Arizona state courts, the limitations on relief imposed by § 2254(d) do not restrict review, and the Court may consider the claim de novo.

### B.   The Arizona Supreme Court imposed an unconstitutional causal nexus requirement.

As a preliminary matter, Hedlund asserts that any Arizona Supreme Court independent review was not a constitutional remedy to cure the causal nexus error for which the federal court granted a conditional writ of habeas corpus for Hedlund. *See* Claim 1, *supra*. However, given that the Arizona Supreme Court conducted an independent review, it was required to, at a minimum, conduct an independent review that met constitutional requirements.

#### 1.   Causal nexus requirements are unconstitutional.

Any state capital sentencing proceeding that will not give effect to mitigation evidence that lacks a causal connection to the crime is unconstitutional. *See McKinney v. Ryan*, 813 F.3d 798, 813 (9th Cir. 2015) (en banc) (citing *Eddings*, 455 U.S. 104). *Eddings* constitutes clearly established federal law and its unreasonable application confers jurisdiction on the federal courts to grant relief under 28 U.S.C. § 2254(d)(1). Under the Eighth and Fourteenth Amendments, imposition and appellate review of a death sentence must not only consider, but also

be able to give effect to, all relevant mitigating evidence.[21] *See Penry v. Lynaugh* (*Penry I*), 492 U.S. 302, 319, 327–28 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002); *Boyde v. California*, 494 U.S. 370, 377–78 (1990) (citing *Lockett*, 438 U.S. 586; *Eddings*, 455 U.S. 104); *see also Tennard*, 542 U.S. at 285. A court may not exclude certain categories of mitigation from meaningful consideration in making the determination regarding leniency for lacking a causal connection. *Tennard*, 542 U.S. at 285.

Imposing any causal nexus requirement on mitigating evidence—indeed, imposing any threshold standard other than the "most expansive" interpretation of the general relevance standard—has "no foundation" in Supreme Court jurisprudence and violates the Eighth and Fourteenth Amendments. *Id.* at 284–85. The Court has explained that it "never countenanced and now ha[s] unequivocally rejected" imposing any causal nexus requirements as a barrier to considering or giving effect to mitigating evidence. *Smith v. Texas*, 543 U.S. 37, 45 (2004). This prohibition on causal nexus requirements furthers the fundamental underpinnings of constitutional capital sentencing: avoiding arbitrary death sentences and judging the character and record of the individual defendant. *See, e.g.*, *Kennedy v. Louisiana*, 554 U.S. 407, 436, *modified on denial of reh'g*, 554 U.S. 945 (2008).

It is not enough for a defendant to be permitted to present evidence and for the court to consider it. *See Tennard*, 542 U.S. at 285. The Supreme Court has described the "give effect to" language of *Penry I* "as 'the key' to that decision." *Id.* at 278. However, where, as here, a state's capital sentencing scheme deems evidence that does not have a causal connection to the crime be given only slight or minimal weight, which cannot be substantial enough to warrant leniency, then it is not given effect to, as *Tennard* and the Eighth Amendment require.[22]

---

[21] "Relevant" in the context of mitigation evidence is a "low threshold." *Tennard*, 542 U.S. at 284–85.

[22] Though it has reverted to imposing a causal nexus test at various periods, *see McKinney*, 813 F.3d at 813–14, immediately after *Eddings*, the Arizona Supreme

1   Supreme Court cases "following *Lockett* have made clear that when the
2   [sentencer] is not permitted to give meaningful effect or a 'reasoned moral
3   response' to a defendant's mitigating evidence—because it is forbidden from doing
4   so by statute or a judicial interpretation of a statute—the sentencing process is
5   fatally flawed." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 264 (2007) (examining
6   the Texas equivalent of Arizona's causal nexus error).

### 2.   A causal nexus test was imposed here.

8   Here, the considerations the Arizona Supreme Court used to determine the
9   weight to give particular mitigating circumstances ultimately precluded the court
10  from giving effect to mitigation that lacked a connection to the crime. *See Tennard*,
11  542 U.S. at 285. It is evident from the Arizona Supreme Court's opinion that it
12  again imposed a causal nexus requirement, making it clear that the only mitigation
13  which could support a life sentence is that which is causally connected to the crime,
14  or fits the parameters of A.R.S. § 13-751(G). This violates the Eighth Amendment
15  requirement of an individualized sentence. It is not enough that the sentencer be
16  able to "consider" the mitigation, there must be no barriers in place to prevent the
17  mitigation from being given effect. *Tennard*, 542 U.S. at 278 (citation omitted). In
18  the context of capital proceedings, mitigation can be given effect when prevailing
19  state court law allows its meaningful consideration to support a life sentence. In
20  Arizona, this means that non-causally connected mitigation must be able to be
21  considered weighty enough to be sufficiently substantial to call for leniency.

---

23  Court correctly explained its constitutional obligations: when, after considering
24  mitigation evidence, the court concludes that the (G)(1) statutory mitigator does not
    exist, "to remain faithful to *Lockett* and [*State v.*] *Watson*, [586 P.2d 1253 (Ariz.
25  1978)], however, the court's inquiry may not end there. The court must consider
26  the offered evidence further to determine whether it in some other way suggests that
    the defendant should be treated with leniency." *State v. McMurtrey*, 664 P.2d 637,
27  646 (Ariz. 1983). Here, the court's inquiry ended before this step, as it deemed any
28  evidence not constituting (G)(1) to categorically have slight or minimal weight,
    without additional analysis.

1      In addressing Hedlund's mitigation, the Arizona Supreme Court repeatedly

2   stated it would not give effect to the mitigation, by giving it more than slight weight,

3   because Hedlund had not shown it "affected his ability to appreciate right from

4   wrong or conform his conduct to law," the mitigation standard under former A.R.S.

5   § 13-703(G)(1). *State v. Hedlund*, 431 P.3d 181, 187, 188 (Ariz. 2018). The (G)(1)

6   statutory mitigating factor requires that mitigation have "some causal effect

7   contributing to the defendant's behavior in the commission of the crime at issue."

8   *McKinney*, 813 F.3d at 813. While it is permissible to give greater weight to

9   statutory mitigation than non-statutory mitigation, a court may not limit mitigation

10   that does not fit this rubric from ever having more than slight weight, without

11   individual consideration of the circumstances.

12      Despite its stated consideration of this mitigating evidence, the Arizona

13   Supreme Court minimized it because it lacked a causal connection to Hedlund's

14   state of mind at the time of the crime. When mitigating evidence lacking a

15   connection to the crime can never have more than slight weight, then it will never

16   be sufficiently substantial to warrant leniency. Thus, under the Arizona Supreme

17   Court's framework, evidence that lacks a causal connection to the crime cannot

18   warrant a life sentence, and thus cannot be given effect to. Categorically assigning

19   less weight to non-causally connected mitigation means that it cannot be given

20   effect to.

21      Here, the Arizona Supreme Court's framework ensured that there was no

22   vehicle for Hedlund's mitigation evidence to lead to a life sentence unless it

23   pertained to his state of mind at the time of the crime—requiring a causal

24   connection. *See Hedlund*, 431 P.3d at 186 (citing A.R.S. § 13-751(G)(1), which

25   "provides for mitigation when '[t]he defendant's capacity to appreciate the

26   wrongfulness of his conduct or to conform his conduct to the requirements of law

27   was significantly impaired, but not so impaired as to constitute a defense to

28   prosecution'").

1      Though throughout its analysis, the Arizona Supreme Court stated that it

2  considered non-statutory mitigating evidence, it declined to give any such evidence

3  more than slight or minimal weight where it did not have a causal nexus to the

4  crime.[23] *See id.* at 187–88. Any analysis the court conducted of the mitigating

5  evidence centered on whether Hedlund's capacity to appreciate the wrongfulness

6  of his conduct or to conform his conduct to the requirements of the law was

7  significantly impaired. *See, e.g.*, *id*. at 186 ("This evidence undermines Hedlund's

8  and the dissent's view that he suffered mental impairments that significantly

9  impaired his capacity to conform his conduct to what the law requires."); *id*. at 187

10  ("The evidence does not support the conclusion that Hedlund lacked the ability to

11  conform his conduct to the requirements of law."); *id.* ("Even if Hedlund was

12  intoxicated when he committed the McClain burglary and murder, nothing in the

13  record suggests alcohol affected his ability to appreciate right from wrong or

14  conform his conduct to law..."); *id.* ("In sum, the expert testimony and the record

15  do not establish that Hedlund could not appreciate right from wrong or conform his

16  conduct to the requirements of law."); *id.* (Hedlund's loyalty to his brother "does

17  not amount to an ability to control his actions."); *id.* ("no evidence shows that

18  Hedlund's difficult childhood affected his ability to control his actions to conform

19  with the law"); *id.* at 188 ("Hedlund was in possession of his faculties and not so

20  impaired by alcohol as to constitute significant mitigation."); *id.* at 190 ("nothing

21  else in the record indicates that Hedlund had impaired capacity, as discussed

22  above").

23      Though it paid lip service to the idea that it considered Hedlund's mitigation

24  for reasons other than the causal connection required by the statutory (G)(1)

25  mitigator, the Arizona Supreme Court's opinion lacks any discussion of whether

26

---

27  [23] The Arizona Supreme Court improperly ignored the other statutory mitigator that
28  Hedlund urged at trial: (G)(2) ("The defendant was under unusual and substantial
   duress, although not such as to constitute a defense to prosecution.").

1    the presented mitigation reduced Hedlund's moral culpability for any other reason

2    (it briefly addressed the plea discussion and Hedlund's minor role in the crime,

3    which have a causal nexus). *Id.* at 188–89.

4         Hedlund argued that while his mitigation was causally connected to the

5    crime, he also urged the court to consider his mitigation for reasons other than those

6    that fell within the statutory mitigators. (*See, e.g.*, DA Doc. 31 at 32, 53–57; DA

7    Doc. 40 at 7–16.) However, here, even if mitigation was proven by a preponderance,

8    it could never be weighty enough to justify a life sentence unless it was directly

9    linked to the crime. Changing the semantics to state "minimal weight" does not

10   correct the constitutional error. Assessing mitigation and its power is an

11   individualized decision. Mitigation should not be categorically minimized to the

12   point of having no effect simply because it is impossible to show a cause and effect

13   relationship at the time of the crime.[24]

14        The Arizona Supreme Court continued to use the causal nexus test as a reason

15   to downgrade the weight of Hedlund's mitigation, justifying it as a weighing test.

16   However, the Ninth Circuit has specifically chastised Arizona federal district courts

17   for "under-weight[ing]" mitigating evidence by utilizing causal nexus reasoning.

18   *Robinson v. Schriro*, 595 F.3d 1086, 1112 (9th Cir. 2010) ("the district court erred

19   when it relied on Robinson's failure to demonstrate a causal connection . . . as its

20   basis for assigning the evidence minimal mitigating weight"). Additionally, in

21   _____

22   [24] Further, the court erred and acted arbitrarily when it found that Hedlund's
     intoxication at the time of the crime was not mitigating due to the nature of the

23   crime and his conduct the next day. *Hedlund*, 431 P.3d at 188 (citing *State v.*

24   *Bocharski*, 189 P.3d 403, 426 (Ariz. 2008)). *Bocharski* cites another Arizona case,
     *State v. Rienhardt*, 951 P.2d 454, 466–67 (Ariz. 1997), for this blanket rule that

25   lessens the weight of intoxication mitigation. The blanket application of a rule to
     exclude mitigation is arbitrary and contrary to federal law. *See Parker v. Dugger*,

26   498 U.S. 308, 321 (1991). Moreover, there is no evidence that Hedlund's crime was
     "deliberate," and the court ignored that Hedlund's ineffectual and haphazard effort

27   to hide evidence after the crime was a product of his abusive childhood, and

28   resulting alcohol addiction, brain impairment, and loyalty to his brother.

*McKinney*, as an example of an unconstitutional causal nexus test, the Ninth Circuit noted a case where the Arizona Supreme Court stated that an abusive family background is "*usually given significant weight*" only if "the abuse affected the defendant's behavior at the time of the crime." *McKinney*, 813 F.3d at 816–17 (emphasis original) (quoting *State v. Hoskins*, 14 P.3d 997, 1021 (Ariz. 2000)).

In *Tennard* and *Penry I*, the Supreme Court confronted similar circumstances, and ruled that the resulting death sentences violated the Eighth Amendment. In both cases, though the defendant was permitted to present various mitigation, jury instructions limited consideration of mitigation evidence to whether it showed that the crime had not been committed deliberately, and to the question of the defendant's future dangerousness. *See Tennard*, 542 U.S. at 277–78; *Penry I*, 492 U.S. at 319–28. In *Tennard*, the Court found this was unconstitutional, as there was no vehicle for Tennard's evidence of mental impairment to be given effect. The Court relied on its conclusion in *Penry I*, 492 U.S. at 319–28, which held that limiting consideration to those two issues violated the Eighth Amendment because it prevented Penry's evidence of childhood abuse and intellectual disability from being given effect. *Tennard*, 542 U.S. at 278-79. In *Penry I*, the Court noted that "[p]ersonal culpability is not solely a function of a defendant's capacity to act 'deliberately.'" 492 U.S. at 322. Further, it noted that intellectual disability (then called mental retardation) is mitigating beyond whether it affects deliberateness. *Id*. at 322–23. In *Tennard*, the Court expanded this principle to include evidence of mental impairment that did not rise to the level of intellectual disability.

### C. Hedlund was prejudiced.

The categorical exclusion of mitigation evidence lacking a causal connection from being given effect prejudiced Hedlund, as it had a substantial and injurious effect on his sentence. *See Brecht*, 507 U.S. at 637. By discounting all mitigation evidence that lacked a causal connection to the crime and giving it only slight weight, the Arizona Supreme Court enacted barriers to it being given effect. It could

not have been sufficiently substantial to warrant leniency, and could not have resulted in a life sentence. The court did this even with evidence that science establishes has a life-long, permeating effect, including Hedlund's abusive childhood, brain impairment, and post-traumatic stress disorder.[25]

Further, the court minimized evidence lacking a causal connection despite a body of constitutional law (described above with respect to *Lockett*, *Tennard*, and *McKinney*) stressing the importance of mitigation not causally connected to the crime, thus prejudicing Hedlund. *See Stanley v. Schriro*, 598 F.3d 612, 624 (9th Cir. 2010) ("Evidence that might not rise to the level of defense of a crime may nonetheless be important mitigation."). At the penalty phase, mitigation evidence additionally "serves to increase jurors' sympathy for or comprehension of the lives, and crimes, of defendants who have themselves suffered terribly." *Doe v. Ayers*, 782 F.3d 425, 462 (9th Cir. 2015) (citations omitted). The Arizona Supreme Court opinion in this case does not reflect any consideration of the humanizing effects of Hedlund's compelling mitigation, only whether it directly affected his capacity at the time of the crime. This myopic focus on legal culpability ignores the dictates of the Eighth Amendment and does not reflect "a reasoned moral response to the

---

[25] *See, e.g.*, WHO, Preventing Child Maltreatment: A Guide to Taking Action and Generating Evidence, 7, 55 (2006) ("child maltreatment can have significant and lifelong adverse effects on the child's mental health and development," including "acute psychological and psychiatric consequences, and the long-term impact on the child's neurological, cognitive and emotional development and overall health"); Valentina Nikulina & C.S. Widom, *Child Maltreatment and Executive Functioning in Middle Adulthood*, 27(4) Neuropsychology (2013) (people who faced chronic neglect as children exhibited "deficits in executive functioning 30 years later, which are not explained by general intellectual functioning, PTSD, or concurrent depression or excessive alcohol use"); E. Schwarz & B.D. Perry, *The Post-Traumatic Response in Children and Adolescents*, Psychiatric Clinics of North America, 17(2): 313 (1994) (plasticity of young brain makes young trauma victims "more susceptible to formation of malignant memories that affect not only the stress response system but also the emerging organization of neural networks regulating other basic states and characteristics").

1    defendant's background, character, and crime." *Penry v. Johnson*, 532 U.S. 782,

2    788 (2001) (citation omitted).

3         Instead of focusing on the lack of a causal nexus, the court should have

4    instead focused on the power of the individual mitigating details. *See Porter v.*

5    *McCollum*, 558 U.S. 30, 43 (2009) (per curiam) (noting that the state court

6    unreasonably discounted the effect that nonstatutory mitigating evidence of

7    childhood abuse and expert evidence regarding brain damage would have had); *see*

8    *also Robinson*, 595 F.3d at 1112 (finding error where the court relied on lack of a

9    causal nexus "as its basis for assigning the evidence minimal mitigating weight").

10        The court minimized evidence that the Supreme Court has found mitigating,

11   even where lacking a causal or temporal connection. For example, in *Williams v.*

12   *Taylor*, 529 U.S. 362, 398 (2000), and *Wiggins v. Smith*, 539 U.S. 510, 516–17, 535

13   (2003), the Supreme Court considered evidence of childhood abuse to be significant

14   mitigation, even when substantial time had elapsed between the crime and the

15   abuse. This contrasts with the Arizona Supreme Court's decision here, which

16   assigned child abuse evidence "little weight because there is neither temporal

17   proximity nor any demonstration that the conditions rendered Hedlund unable to

18   differentiate right from wrong or to control his actions." *Hedlund*, 431 P.3d at 187.

19       **D.    The Arizona Supreme Court's decision was an unreasonable**
20              **application of clearly established federal law, and involved an**
21              **unreasonable determination of the facts.**

22        As discussed above, the Arizona Supreme Court's decision was an

23   unreasonable application of "clearly established Federal law, as determined by the

24   Supreme Court of the United States," *see* 28 U.S.C. § 2254(d)(1), requiring that all

25   relevant mitigation evidence be considered and not barred from being given effect

26   to due to a lack of a causal nexus. Thus, the strictures of AEDPA do not apply.

27   Further, the decision involved an unreasonable determination of the facts, and thus

28   the strictures of AEDPA do not apply for that reason as well. *See* § 2254(d)(2).

1     A fact-finding process is flawed and this Court "can't accord AEDPA

2 deference when the state court 'has before it, yet apparently ignores,' evidence that

3 is 'highly probative and central to petitioner's claim.'" *Milke v. Ryan*, 711 F.3d 998,

4 1008 (9th Cir. 2013) (quoting *Taylor v. Maddox*, 366 F.3d 992, 1000, 1001 (9th Cir.

5 2004)). The Arizona Supreme Court did this repeatedly.

6     For example, in its ruling, the Arizona Supreme Court gave Hedlund's

7 childhood abuse no effect because it lacked "temporal proximity," noting that

8 Hedlund ran away to live with his natural mother at thirteen and therefore, the

9 evidence could not meet the requirements of statutory mitigation. *Hedlund*, 431

10 P.3d at 187–88. This ignored all the facts in the record about the dysfunction in his

11 natural mother's household and the fact that Hedlund did not recover overnight

12 from his childhood abuse, as illustrated by his ongoing alcoholism, PTSD, brain

13 damage, and suicide attempt as a young adult. *See* Hedlund's Personal History,

14 *supra*.

15     The Arizona Supreme Court also ignored all of the evidence showing that

16 childhood abuse directly affected Hedlund's relationship with McKinney, making

17 Hedlund extremely loyal and protective of McKinney, and as a result, changing his

18 behavior and explaining his actions at the time of the crime. *See id.* at 191–92, 196–

19 97 (Vasquez, J., dissenting); (ROA 259 at 13–14; Tr. 7/23/1993 at 67, 81; Tr.

20 7/26/1993 at 85, 93–96); *see also Porter*, 558 U.S. at 43 (state court erred in

21 discounting to irrelevance how Porter's abusive childhood impacted his personal

22 relationships, and therefore, would have had "particular salience" for the fact-finder

23 in determining the appropriate sentence). The court ignored the power and control

24 McKinney exerted over Hedlund, and ignored the statutory (G)(2) mitigating factor

25 Hedlund urged at trial: "The defendant was under unusual and substantial duress,

26 although not such as to constitute a defense to prosecution." (*See* Tr. 7/28/1993 at

27 58–60; Tr. 7/26/1993 at 10–11, 15–17 (testimony regarding how McKinney

28 controlled Hedlund), 27–28 (same); Tr. 7/27/1993 at 22, 34; Tr. 7/30/1993 at 20–

21.) Even the majority opinion recognized that as children, Hedlund and McKinney were "encouraged and rewarded" for stealing, *see Hedlund*, 431 P.3d at 187, but ignored the facts illustrating how this had a causal connection to the crime.

The Arizona Supreme Court also made an unreasonable determination of the facts in writing that Hedlund "asserts that expert testimony he presented during sentencing establishes substantial mitigating weight under § 13-751(G)(1)," and then proceeding to only analyze the expert testimony under that mitigator, which requires that mitigation evidence show that "[t]he defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution." *Hedlund*, 431 P.3d at 186. In his briefing before the Arizona Supreme Court, Hedlund did not limit his urging of the expert testimony only under the confines of the statutory mitigator. Hedlund also urged the court to consider the mitigating evidence to the extent that it reduced his moral culpability for reasons other than those which bear a causal connection. *See, e.g.*, DA Doc. 31 at 29–33; DA Doc. 40 at 15–16, 27–29.

The Arizona Supreme Court also erred in discounting expert testimony based on defense expert Dr. Ronald Holler's testimony on cross-examination that Hedlund would have been able to modify his behavior had a police officer been at his elbow, thus his ability to conform his conduct to the law was not impaired. Because of this, according to the Arizona Supreme Court, the defense experts were not at all credible. *Hedlund*, 431 P.3d at 186–87. However, this mischaracterized the testimony, as Dr. Holler testified that he believed Hedlund "would consider" that there was a police officer in the vicinity. (Tr. 7/27/1993 at 33.) It also ignored the fact that Dr. Holler clarified this testimony, explaining that without this imaginary police officer, Hedlund's "dynamics become predominant and lead, have lead him into actions which in terms of strictly intellectual capability, he would not do." (Tr. 7/27/1993 at 33.) And, as the Arizona Supreme Court dissent noted, "there

was no police officer present" on the night of the crime, "so Hedlund's judgment indeed was influenced by what Dr. Holler characterized as his 'neurological impairment' at the time." *Hedlund*, 431 P.3d at 193.

### E.    Conclusion

The Arizona Supreme Court's consideration of Hedlund's mitigating circumstances violated the bedrock principles of reliability in sentencing. *See, e.g.*, *Tennard*, 542 U.S. at 285; *Eddings*, 455 U.S. at 112–15. By conditioning the value of a factor like mental health or intoxication on the circumstances of the crime, the court failed to take into account Hedlund's personal characteristics, as required by *Eddings*, 455 U.S. at 112, and the Eighth Amendment, and unconstitutionally injected an impermissible dose of irrationality into Hedlund's sentencing. *See Parker*, 498 U.S. at 321. And, by applying a causal nexus test, the court enacted a barrier to giving effect to Hedlund's mitigation. *See Tennard*, 542 U.S. at 285. As a result, the Arizona Supreme Court's decision is contrary to clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). It was also an unreasonable determination of the facts. *Id*. at (d)(2). This had a "substantial and injurious effect or influence" on Hedlund's sentence, and thus caused actual prejudice, warranting relief. *Brecht*, 507 U.S. at 637. Hedlund's sentence is constitutionally infirm, and he is entitled to relief.

### CLAIM THREE

**The Arizona Supreme Court unconstitutionally refused to consider Hedlund's relevant mitigation evidence developed since his 1993 sentencing hearing.**

Hedlund's death sentence violates the Eighth and Fourteenth Amendments to the United States Constitution because the Arizona Supreme Court, in its decision determining whether Hedlund should be sentenced to death in its 2018 independent review, categorically excluded relevant mitigation evidence developed in post-conviction proceedings from being considered. *See Lockett v. Ohio*, 438 U.S. 586, 605–06 (1978); *Eddings v. Oklahoma*, 455 U.S. 104 (1982). This denied Hedlund

a constitutionally-required individualized sentence, and impermissibly injected arbitrariness into his sentencing. *See Woodson v. North Carolina*, 428 U.S. 280, 303 (1976) (plurality opinion); *Furman v. Georgia*, 408 U.S. 238, 463 (1972) (Powell, J., dissenting) (per curiam). This had a "substantial and injurious effect or influence" on Hedlund's sentence, and thus caused actual prejudice, warranting relief. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Hedlund hereby incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

### A. Procedural posture

Hedlund raised this issue in his supplemental briefing in the independent review proceedings, as requested by the Arizona Supreme Court. (DA Doc. 47 at 1–5.) He also raised it in his motion for reconsideration in the Arizona Supreme Court (DA Doc. 54 at 16–19), which the court denied (DA Doc. 57). The Arizona Supreme Court's decision was contrary to clearly established federal law, as discussed below. *See* 28 U.S.C. § 2254(d)(1). Further, it was an unreasonable determination of the facts, based on the state-court record. § 2254(d)(2).

In the alternative, if this Court finds this claim was not exhausted, then this claim was not raised in state court because it previously was not available or ripe for review, and there is an absence of state corrective process that would effectively protect Hedlund's rights. *See* 28 U.S.C. § 2254(b)(1)(B). Because this claim challenges adjudications by the highest court of Arizona, it is not possible to challenge these determinations in other Arizona state courts, and any effort to do so would be futile. *See id.* Thus, there is no available forum to exhaust this claim.

### B. The Arizona Supreme Court unconstitutionally refused to consider Hedlund's mitigation evidence introduced since his first independent review.

In conducting this independent review, the Arizona Supreme Court refused to consider relevant mitigation evidence that had been developed since Hedlund's

1    trial. *State v. Hedlund*, 431 P.3d 181, 184–85 (Ariz. 2018).

2          Under the Eighth and Fourteenth Amendments, those imposing and
3    conducting appellate review of a death sentence must not only consider, but also be
4    able to give effect to, all relevant mitigating evidence.[26] *Penry v. Lynaugh* (*Penry*
5    *I*), 492 U.S. 302, 319, 327–28 (1989), *abrogated on other grounds by Atkins v.*
6    *Virginia*, 536 U.S. 304 (2002); *Boyde v. California*, 494 U.S. 370, 377–78 (1990)
7    (citing *Lockett*, 438 U.S. 586; *Eddings*, 455 U.S. 104); *see also Tennard*, 542 U.S.
8    at 285. Supreme Court cases following *Lockett* have made clear that a sentencing
9    process that bars certain categories of relevant mitigation from consideration "is
10   fatally flawed." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 264 (2007).

11         In failing to consider this relevant mitigating evidence, the court failed to
12   undertake the required "consideration of the character and record of the individual
13   offender and the circumstances of the particular offense" a "constitutionally
14   indispensable part of the process of inflicting the penalty of death." *Woodson*, 428
15   U.S. at 304. "[I]n capital cases the fundamental respect for humanity underlying the
16   Eighth Amendment" requires this. *Id.*

17         Further, the exclusion of mitigation evidence developed following Hedlund's
18   first independent review impermissibly injected arbitrariness into his sentencing.
19   *See, e.g.*, *Woodson*, 428 U.S. at 303 (plurality opinion). Because capital punishment
20   differs from all other forms of criminal punishment in terms of severity and
21   irrevocability, it is prohibited in the absence of certain constitutional safeguards.
22   *Gregg v. Georgia*, 428 U.S. 153, 187 (1976) (Stewart, J., announcing judgment of
23   the court, and opinion of Stewart, J., Powell, J., and Stevens, J.). That is, the Eighth
24   and Fourteenth amendments prohibit all sentencing procedures creating a
25   substantial risk that the death penalty is inflicted in an arbitrary and capricious
26   manner. *Gregg*, 428 U.S. at 188.

27   _____

28   [26] "Relevant" in the context of mitigation evidence is a "low threshold." *Tennard*,
     542 U.S. at 284–85.

1    Lastly, by failing to consider this evidence, the Arizona Supreme Court

2    behaved arbitrarily by failing to follow its own guidelines for independent review,

3    violating Hedlund's rights to due process and to be free from cruel and unusual

4    punishment. Especially in a capital case, the defendant "has a substantial and

5    legitimate expectation that he will be deprived of his liberty" only after the state has

6    followed its own statutory guidelines setting forth the mandatory protections

7    guaranteed to preserve a defendant's right to a fair trial and adequate representation.

8    *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980) (recognizing that the grant of a state-

9    law procedural right to a criminal defendant at sentencing can give rise to a

10   constitutionally protected liberty interest).

11   The scope of independent review required the Arizona Supreme Court to

12   consider the evidence now in the record from state post-conviction and federal

13   habeas. In *State v. Stuard*, 863 P.2d 881, 897 (Ariz. 1993), the Arizona Supreme

14   Court explained that consistent with its "duty of independent review, we have

15   examined the entire record." *Id*. This included reviewing the issue of the

16   defendant's psychiatric condition, even though neither party addressed this issue on

17   appeal. *Id.* The entire record in this case now includes post-conviction evidence.

18   The record review required for independent review has been described as

19   "painstaking[]." *Id.* (citation omitted). More is demanded than in non-capital cases

20   because of the "gravity of the death penalty." *State v. Brewer*, 826 P.2d 783, 790

21   (Ariz. 1992). The Arizona Supreme Court has defined its procedure for independent

22   review:

23       When a death sentence is imposed in Arizona, this court independently
         reviews the entire record for error, determines whether the aggravating
24       circumstances have been proved beyond a reasonable doubt, considers
         any mitigating circumstances, and then weighs the aggravating and
25       mitigating circumstances in deciding whether there are mitigating
26       circumstances sufficiently substantial to call for leniency.

27

28   *State v. Stokley*, 898 P.2d 454, 465 (Ariz. 1995).

The purpose behind independent review requires a review of the entirety of the record available, because the aim is ensuring that Hedlund's death sentence conforms with the Eighth and Fourteenth Amendments. *Id.* The Arizona Supreme Court was required to determine whether Hedlund's individual culpability, weighed against the mitigation, was so truly exceptional and above the norm that the ultimate penalty should be exacted. *See State v. Bible*, 858 P.2d 1152, 1209 (Ariz. 1993). Evidence of Hedlund's brain damage and other mental health evidence is highly relevant in answering this question. *See, e.g.*, *Sears v. Upton*, 561 U.S. 945, 945–46 (2010) (per curiam) (finding fault with the prejudice determination where the defendant had frontal lobe damage).

The Arizona Supreme Court's duty is not to determine whether the trial court properly imposed the death penalty or whether its findings were "factually supported" or "justified by the evidence." *State v. Watson*, 628 P.2d 943, 946 (Ariz. 1981). It is whether the Arizona Supreme Court, in its independent judgment, believes "based upon the record before us," that "the death penalty should be imposed." *Id*. Given this broad duty, the court must consider the post-conviction and habeas evidence.

**C.    This exclusion of mitigation evidence prejudiced Hedlund.**

The court's unconstitutional exclusion of mitigation evidence developed after his first independent review had a "substantial and injurious effect or influence" on Hedlund's sentence, and thus caused actual prejudice, warranting relief. *Brecht*, 507 U.S. at 637.

As explained in claim 2, *supra*, the Arizona Supreme Court imposed a causal nexus requirement on Hedlund's mitigation—that is, the court could not give effect to mitigation evidence lacking a causal nexus to the crime in determining whether to impose a life sentence. Hedlund's post-conviction evidence does support—and indeed, confirms—a finding that a causal nexus does exist between the crimes and Hedlund's mitigation evidence, illustrating that exclusion of this evidence caused

actual prejudice to Hedlund. If the Arizona Supreme Court had considered it, it may have found it sufficiently substantial to call for leniency. In post-conviction, neuropsychologist Dr. Marc Walter, Ph.D., connected Hedlund's drinking, brain damage, and abusive childhood to Hedlund's state of mind at the time of the crime, concluding the connection was strong enough to show that Hedlund's impairments were significant enough to prevent him from conforming his behavior to the law. (DA Doc. 33 at Appendix V2 74–76 (Amended PCR Petition, Mar. 27, 2000, at App. A13-20)).)

The failure of the state court to consider the additional mitigation was prejudicial for other reasons. At trial, defense mental health expert Dr. Ronald Holler, Ed.D., testified that Hedlund's IQ results were indicative of brain damage. (Tr. 7/27/1993 at 18–20.) Here, the Arizona Supreme Court agreed with the sentencing court, generally rejecting the unrebutted testimony of Hedlund's experts as lacking in credibility. *Hedlund*, 431 P.3d at 186. Dr. Walter's report serves to buttress the defense testimony at trial, which was dismissed as not sufficiently credible.

The findings in post-conviction and federal habeas confirm that Hedlund does indeed have brain damage, as Dr. Holler testified was indicated. (Tr. 7/27/1993 at 18–20.) Dr. Walter also confirmed Dr. Holler's diagnosis of PTSD (Tr. 7/27/1993 at 7–10, 14; DA Doc. 33 at Appendix V2 74–76), a condition the Supreme Court has found to be compelling enough to require resentencing where defense counsel failed to present it, along with other mitigation. *See Porter v. McCollum*, 558 U.S. 30, 35 n.4 (2009) (per curiam) (noting that Porter's expert testified that his symptoms warranted a PTSD diagnosis). The Arizona Supreme Court places a high value on brain damage evidence as well. *See, e.g.*, *Stuard*, 863 P.2d at 902 (reducing three death sentences to life where experts agreed the defendant had brain damage, though the trial court had not found it mitigating).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### D.    Conclusion

The Arizona Supreme Court's failure to actually consider Hedlund's mitigating circumstances violated the bedrock principles of reliability in sentencing. *See, e.g.*, *Lockett*, 438 U.S. 586; *Tennard*, 542 U.S. at 285; *Eddings*, 455 U.S. at 112–15; *Furman*, 408 U.S. 238; *Woodson v. North Carolina*, 428 U.S. 280. By refusing to consider mitigation evidence introduced after Hedlund's first independent review, the court failed to take into account Hedlund's personal characteristics, as required by *Lockett* and the Eighth Amendment. *See Eddings*, 455 U.S. at 112. Further, the court injected an impermissible dose of irrationality into Hedlund's capital sentencing. *See Parker*, 498 U.S. at 321. As a result, the Arizona Supreme Court's decision is contrary to clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). These constitutional errors had a "substantial and injurious effect or influence" on Hedlund's sentence, and thus caused actual prejudice, warranting relief. *Brecht*, 507 U.S. at 637.

### CLAIM FOUR

**The Arizona Supreme Court's decision that Hedlund warrants the death penalty and imposing death on Hedlund violates the Eighth and Fourteenth Amendments, as Hedlund is not among the worst of the worst offenders warranting death.**

Hedlund's sentence violates the Eighth and Fourteenth Amendments to the United States Constitution, as he is not among the worst of the worst offenders warranting death. Any state capital punishment scheme that permits Hedlund to receive the death penalty does not adequately narrow the class of offenders eligible for death, and does not adequately take into account his personal history. Hedlund incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

### A.    Procedural Posture

Hedlund asserted in the Arizona Supreme Court that sentencing him to death would violate the Eighth and Fourteenth Amendments, because he did not fit into

70

the narrow class of offenders warranting death. (DA Doc. 31 at 34–61.) Since then, the sole statutory aggravating factor upon which the Arizona Supreme Court determined Hedlund to be eligible for a sentence of death, to wit, that the murder was committed "as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value," *see* former A.R.S. § 13-703(F)(5), and to which the court gave substantial weight in imposing the death penalty, was repealed in relevant part by the State of Arizona effective August 27, 2019, *see* A.R.S. § 13-751(F) (West 2019).

The Arizona Supreme Court impliedly ruled on the merits of this claim in entering a new judgment that Hedlund should be sentenced to death. *See State v. Hedlund*, 431 P.3d 181, 190–91 (Ariz. 2018). The state court decision was an unreasonable application of, or contrary to, clearly established federal law, *see* 28 U.S.C. § 2254(d)(1), and an unreasonable determination of the facts, *id.* § 2254(d)(2). Accordingly, § 2254(d) places no limitation on relief, and this Court should review the claim de novo.

In the alternative, if this Court finds that this claim was not raised in state court, this is because it previously was not available or ripe for review, and there is an absence of state corrective process that would effectively protect Hedlund's rights. *See* § 2254(b)(1)(B). Because this claim challenges adjudications by the highest court of Arizona, it is not possible to challenge these determinations in Arizona state courts, and any effort to do so would be futile. *See id*. Thus, there is no available forum to exhaust this claim.

## B.   Hedlund is not among the worst of the worst people convicted of first-degree homicide.

For the death penalty to be constitutional, it must reflect "a reasoned moral response to the defendant's background, character, and crime." *Penry v. Johnson*, 532 U.S. 782, 788 (2001) (citation omitted). Further, in order to meet the constitutional requirement that the imposition of the death penalty not be "arbitrary

1    and capricious," *Gregg v. Georgia*, 428 U.S. 153, 188 (1976), a state's death penalty
2    scheme must not permit death sentences in first-degree murder cases that do not
3    stand out as the worst of the worst. *See id.*; *see also Godfrey v. Georgia*, 446 U.S.
4    420, 432–33 (1980).

5          The Arizona Supreme Court has echoed this, noting that the death penalty is
6    reserved for "those who stand out from the norm of first degree murderers." *State*
7    *v. Spears*, 908 P.2d 1062, 1080 (Ariz. 1996) (quoting *State v. Smith*, 707 P.2d 289,
8    303 (Ariz. 1985)). As the dissenting judge in Hedlund's Arizona Supreme Court
9    case found, "Hedlund does not meet this criterion." *Hedlund*, 431 P.3d at 191
10   (Vasquez, J., dissenting) The Arizona Supreme Court's decision finding that he did
11   involved an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1);
12   *see also Murdaugh v. Ryan*, 724 F.3d 1104, 1115–16 (9th Cir. 2013) (explaining
13   that in Arizona, to impose death, the trier of fact must find at least one statutory
14   aggravating circumstance, and must also find that aggravating circumstances are
15   not outweighed by mitigating factors); *see also Hurst v. Florida*, 136 S. Ct. 616
16   (2016).

17          **1.     Hedlund's sole aggravator is not especially weighty.**

18          Hedlund's sole aggravator at trial, pecuniary gain, cannot be said to carry
19   strong weight in Hedlund's case. For the Arizona Supreme Court to say that it does
20   unconstitutionally inserts arbitrariness into the process. *See Gregg*, 428 U.S. at 188
21   (a state's aggravators must be sufficiently narrow); *Godfrey*, 446 U.S. at 432–33.

22          First, the sole statutory aggravating factor upon which the Arizona Supreme
23   Court determined Hedlund to be eligible for a sentence of death, that the murder
24   was committed "as consideration for the receipt, or in expectation of the receipt, of
25   anything of pecuniary value," *see* former A.R.S. § 13-703(F)(5), was repealed in
26   relevant part effective August 27, 2019, *see* A.R.S. § 13-751(F) (West 2019). That
27   is, Hedlund's single aggravator—pecuniary gain, where the crime was not a
28   murder-for-hire—has been eliminated as an aggravating factor in Arizona. *See* S.B.

1314, 54th Leg., 1st Sess. (Ariz. 2019), available at 2019 Ariz. Legis. Serv. Ch. 63 (S.B. 1314) (WEST); *see also* Arizona House of Representatives, Fact Sheet on S.B. 1314: death penalty; aggravating circumstances, available at https://apps.azleg.gov/BillStatus/GetDocumentPdf/468582 (explaining how the bill eliminates as an aggravating circumstance that the defendant "[c]ommitted the offense expecting to receive something of pecuniary value, unless the defendant committed the offense for payment"). The Arizona legislature has determined that the conduct that aggravated Hedlund's crime and warranted a death sentence no longer makes one among the narrow class of people who warrant being put to death, and are eligible for the death penalty. To still put him to death based on this conduct violates the Eighth Amendment's prohibition of cruel and unusual punishment. Further, it raises concerns of equal punishment under the Fourteenth Amendment, as someone who committed the same crime Hedlund was involved in today would not be eligible for the death penalty under today's version of (F)(5).[27]

Further, the evidence supporting the pecuniary gain factor here is not strong. The Arizona Supreme Court ignored and mischaracterized evidence in the record in finding that it was "especially strong." *Hedlund*, 431 P.3d at 185; *see also* 28

---

[27] At the appropriate time, when Hedlund's Petition for Writ of Certiorari is no longer pending in the United States Supreme Court, Hedlund intends to move this Court for a stay under *Rhines v. Weber*, 544 U.S. 269 (2005), and return to the Arizona state court to exhaust this claim under Arizona Rule of Criminal Procedure 32.1(g). The repeal of the pecuniary gain aggravating factor circumscribes the class of offenders eligible for a sentence of death under Arizona law, just as cases like *Atkins v. Virginia*, 536 U.S. 304 (2002), and *Roper v. Simmons*, 543 U.S. 551 (2005), circumscribe the class of offenders eligible for a sentence of death by removing from death-eligibility those suffering from intellectual disability or those under the age of 18 at the time of the crime, respectively. As such, the repeal of (F)(5) is substantive. The Arizona Supreme Court applies substantive changes in the law retroactively, consistently with the test set forth in *Teague v. Lane*, 489 U.S. 288 (1989) (plurality opinion). *See State v. Towery*, 64 P.3d 828, 831 (Ariz. 2003). As the *Towery* Court clearly stated, "Petitioners whose cases have become final may seek the benefit of new substantive rules." *Id.* (citing *Bousley v. United States*, 523 U.S. 614, 620 (1998)).

U.S.C. § 2254(d)(2). "[T]he state-court fact-finding process is undermined where the state court has before it, yet apparently ignores, evidence that supports the petition's claim." *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004), *abrogated on other grounds by Murray v. Schriro*, 745 F.3d 984 (9th Cir. 2014). Further, "where the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable." *Id.*

In coming to its conclusion, the Arizona Supreme Court cited the trial court's findings regarding the aggravator, which referred to both Hedlund and his co-defendant and brother, McKinney, together, not just Hedlund. *Hedlund*, 431 P.3d at 185 (citing Tr. 7/30/1993 at 14–16). The Arizona Supreme Court found that witness testimony that Hedlund said he would beat anyone who was present at the burglary showed his intent to kill for pecuniary gain. However, a plain reading of the state court record make clear that this was an effort to dissuade his brother from shooting anyone, or causing further damage, as the dissenting judge found:

> Hedlund did say that he would hit anyone on the head who was home. But that was only in response to McKinney's assertion that he would shoot whomever he encountered and, according to C.M., was meant to "give [McKinney] a different idea" and get McKinney "away from the idea ... of hurting anyone." Placed in context, this statement does not so clearly imply what the majority asserts it does. Rather, it again fits Hedlund's profile of attempting to mitigate McKinney's aggressive tendencies.

*Id.* at 196 (Vasquez, J., dissenting). At trial, the witness who testified that Hedlund said they could sneak in and hit anyone they encountered over the head also explained that this was an effort by Hedlund to talk his brother out of shooting anyone. (Tr. 10/29/1992 at 134–35.) The Arizona Supreme Court ignored this testimony, and ignored Hedlund's statement that he would not shoot a person if he encountered one. *See Hedlund*, 431 P.3d at 185; *see also Taylor*, 366 F.3d at 1001.

1   Next, the Arizona Supreme Court ignored that McKinney had strong motive
2   to commit the burglaries, given that he had no job, was freshly out of prison and
3   owed thousands of dollars. (ROA 259 at 13–14; Tr. 7/23/1993 at 67; Tr. 11/4/1992
4   at 8; Tr. 10/29/1992 at 54–55.) It also ignored that Hedlund, in contrast, "had a
5   steady job, owned his car, could afford what small bills he had, and was able to
6   financially assist his sisters and mother." *Hedlund*, 431 P.3d at 196 (Vasquez, J.,
7   dissenting); (*see also* Tr. 7/23/1993 at 78–79; Tr. 7/27/1993 at 50; Tr. 7/28/1993 at
8   26.) "On the night McKinney proposed committing burglary, Hedlund repeatedly
9   stated he was not interested and thought it was 'a stupid idea.'" *Hedlund*, 431 P.3d
10   at 196 (Vasquez, J., dissenting); (*see also* Tr. 10/29/1992 at 122). The evidence
11   supporting pecuniary gain at trial pointed to McKinney, not Hedlund.

12   Further, the evidence the Arizona Supreme Court cited to support the
13   "especially strong" nature of the aggravator was based heavily on the testimony of
14   two teenage witnesses, Joe Lemon and Chris Morris, who were permitted to be
15   asked leading questions on direct examination, undermining the reliability of their
16   testimony. (Tr. 10/28/1992 at 13.) The Arizona Supreme Court itself recognized
17   that Morris and Lemon's involvement in the McKinney burglaries at issue called
18   into question their reliability as witnesses when their testimony supported
19   Hedlund's limited involvement. *Hedlund*, 431 P.3d at 188. However, the court
20   ignored this fact when citing their testimony for the pecuniary gain aggravator. Both
21   Lemon and Morris had every reason to cast suspicion away from themselves and
22   onto the defendants, as well as an incentive to testify favorably for the State.
23   Further, the breadth of Lemon's juvenile criminal record and the benefits he
24   received in exchange for his testimony were improperly suppressed by the State at
25   trial, and for decades after. This suppression of material evidence violated
26   Hedlund's rights under the Fourteenth Amendment. *See Brady v. Maryland*, 373
27   U.S. 83, 87 (1963).

28   An aggravator that rests almost entirely on the testimony of these two

1    witnesses is not "strong." These teenage witnesses were especially susceptible to

2    leading and ambiguous questions, and their answers changed frequently, depending

3    upon how questions were phrased. (Tr. 10/28/1992 at 37–132; Tr. 10/29/1992 at

4    42–185.) Their testimony was ambiguous as to whom they were referring. Before

5    the examination of Lemon and Morris, defense counsel expressed concern about

6    them being questioned in terms of "they" or "we", without any delineation between

7    Hedlund and McKinney. (Tr. 10/29/1992 at 9–10.) The court agreed, noting the

8    prosecutor should caution Lemon and Morris on "we" or "they" statements. (Tr.

9    10/28/1992 at 9–10.) Despite this earlier admonishment, the judge allowed

10   prosecutors to phrase questions in terms of "did *they* say this?" or "did *James or*

11   *Michael* do that?" (*See, e.g.*, Tr. 10/28/1992 at 54, 62; Tr. 10/29/1992 at 58, 66.)

12       It was later revealed these witnesses often meant either McKinney and/or

13   Morris, not Hedlund, when answering the prosecutor's "they" questions. (*See, e.g.*,

14   Tr. 10/28/1992 at 54–55.) Testimony showed that Hedlund wanted nothing to do

15   with the burglaries perpetrated by McKinney and Morris, and did not need money

16   the way McKinney did. (Tr. 10/28/1992 at 54–55, 98–103, 119, 122, 128–29, 132;

17   Tr. 10/29/1992 at 64–66.) The particular statements that the court cited to uphold

18   the aggravator largely pertained to *both* McKinney and Hedlund—or are unclear to

19   whom they pertain. *See, e.g.*, *Hedlund*, 431 P.3d at 185.

20       Further, the Arizona Supreme Court cited a number of additional

21   unsupported or out-of-context statements to support its finding that the pecuniary

22   gain aggravator was particularly weighty. For example, the court found that forensic

23   testing indicated there was blood on Hedlund's gun, *see Hedlund*, 431 P.3d at 190,

24   however, the State's serologist testified that she could not identify it conclusively

25   as blood, much less determine whether it was human or animal blood (Tr. 11/4/1992

26   at 58). The court ignored that Hedlund had a steady job and limited expenses, with

27   little need for money. (Tr. 10/28/1992 at 130; Tr. 7/23/1993 at 33, 78–79; Tr.

28   7/27/1993 at 50–51.) The court also ignored state court precedent that proving that

1    property was taken "does not necessarily prove the motivation for a murder." *State*

2    *v. Greenway*, 823 P.2d 22, 31 (Ariz. 1991) (citation omitted).

3         It was unreasonable for the court to find that "Hedlund's only motive in

4    shooting McClain was to facilitate the burglary—it was not merely the unintended

5    result of a burglary gone awry." *See Hedlund*, 431 P.3d at 189. The evidence makes

6    clear this was not the case. First, the trial judge did not find that Hedlund shot

7    McClain. (Tr. 7/30/1993 at 8–9.) While the evidence may indicate that Hedlund

8    participated in the McClain robbery, "it does not, in fact, support the conclusion

9    that he shot McClain." *See id*. (Vasquez, J., dissenting). At Hedlund's sentencing,

10    the trial court, after citing that same evidence, asserted "'it is unclear as to whether

11    Mr. Hedlund or Mr. McKinney fired the shot which actually killed Mr. McClain.'"

12    *Id.* (citing Tr. 7/30/1993 at 8.) The Arizona Supreme Court decision ignored that

13    the trial court specifically held that for sentencing purposes, "there is simply no

14    evidence to support a conclusion as to which of these two defendants killed the

15    victim in this case." (Tr. 7/30 1993 at 8–9.)

16         Finally, the court ignored Hedlund's other reasons for associating with his

17    brother during the burglary spree and attempting to dispose of the weapons—his

18    loyalty and desire to protect his brother, even when it was against his best interest,

19    as a result of their extraordinarily traumatic childhood. The court ignored that

20    evidence at trial established that Hedlund waited inside his car while McKinney and

21    Morris committed burglaries. (Tr. 10/29/1992 at 68–69, 114–15, 127–37.) Hedlund

22    only mentioned the possibility of going into a house himself in order to keep his

23    brother Morris from getting into further trouble. (Tr. 10/29/1992 at 136–37.)

24         The dissenting judge in Hedlund's case in the Arizona Supreme Court found

25    that the while the pecuniary gain factor was proven, it could not be said to be

26    especially strong. *Hedlund*, 431 P.3d at 194 (Vasquez, J., dissenting). The dissent

27    wrote that while it was *one* motive of Hedlund's, it was not his sole motive, and

28    given his competing motives, it was not especially strong. *Id*. at 195, n.5. The

dissent noted that the majority provided no analysis for its conclusory finding that there was overwhelming evidence that pecuniary gain was the primary, if not sole, purpose of the murders. *Id*. Further, "[a]lthough it is true as it applies to McKinney, for the reasons that follow, the evidence simply does not support that same conclusion as it applies to Hedlund." *Id*.

While Hedlund asserts that the pecuniary gain factor was not established, if it did exist, he agrees with the dissent's analysis: it was a minor motive for him. Instead, "Hedlund's overarching motivation was, as it had been since childhood, to protect his siblings, follow along with McKinney, particularly as McKinney grew more aggressive in the months leading up to the crimes, and to mitigate, to the extent he could, his brother's criminal tendencies." *Id*. at 196 (Vasquez, J., dissenting). The dissenting judge understood:

> After considering all the evidence, it is clear that Hedlund's motivation to participate in the crimes could just as easily have been out of love for and loyalty to McKinney, as well as a misguided attempt to mitigate McKinney's actions and their consequences, as it was out of a personal desire to benefit financially. *Cf. White v. Ryan*, 895 F.3d 641, 645–46, 658–59, 673 (9th Cir. 2018) (counsel ineffective for not challenging pecuniary gain where evidence showed co-defendant planned murder and pressured defendant into committing crime on her behalf, "suggesting [defendant] acted out of love rather than pecuniary gain"); *State v. Prasertphong*, 206 Ariz. 167, 170 ¶¶ 6, 11–13, 76 P.3d 438, 441 (2003) (pecuniary gain not proved where evidence showed defendant may have been "unaware" of co-defendant's intent to kill and post-murder actions possibly committed "out of shock or panic").

*Id*. at 196–97. Indeed, the dissent correctly noted that Hedlund's evidence of childhood abuse, and his resulting loyalty to his brother even when it flew in the face of his best interest, directly lessened the weight of the aggravating factor, as it explained his main motive.

Lastly, in weighing this evidence, the dissent wrote: "Cases in which this Court affirmed the death penalty where the sole aggravator was pecuniary gain are

not common." *Id*. at 194. He went on to explain:

> And, a comparison of those cases reveals striking similarities that shed
> light on the strength of the aggravating circumstance in this case. Not
> only were the murders in those cases carefully conceived and planned,
> but there was an intimate relationship of trust between the victim and
> the defendant, or they involved a murder-for-hire killing arranged by the
> victim's loved one.

*Id.* at 194–95 (citing cases).

The Arizona Supreme Court's finding that Hedlund's sole aggravator, pecuniary gain, was especially weighty was arbitrary, and failed to circumscribe the class of people convicted of first-degree murder who warrant death. This was unconstitutional. It also was based on an unreasonable factual determination based on the state court record. *See* 28 U.S.C. § 2254 (d)(2).

### 2. Hedlund's extensive mitigation outweighs the slight weight of the sole aggravating factor.

Given the power of Hedlund's mitigating evidence, his lesser role in the crime, and the weakness of the sole aggravating factor, the resulting sentence should have been life. As discussed *supra*, Hedlund had a uniquely horrific childhood. (*See* Hedlund's Personal History, *supra*.) He suffered brain damage and mental health disorders including post-traumatic stress disorder and alcohol addiction as a result. Also as a result, he had extreme, pathological loyalty to his siblings, even when it was not in his best interest, or resulted in behavior he would not have undertaken otherwise. The Arizona Supreme Court dismissed all of this, categorically assigning it slight weight because it lacked a causal connection to the crime. (*See* Claim 2, *supra*.) While, as the court noted, it may assign less weight to mitigation that lacks a causal connection, *Hedlund*, 431 P.3d at 185–86, it may not categorically exclude it from being substantial enough to warrant a life sentence where it lacks this connection. *See McKinney v. Ryan*, 813 F.3d at 816–17 (quoting *State v. Hoskins*, 14 P.3d 997, 1021 (Ariz. 2000) (noting it constituted a causal nexus error where the

1   Arizona Supreme Court stated a type of mitigation evidence is "usually given

2   significant weight" only if "the abuse affected the defendant's behavior at the time

3   of the crime")).

4          Further, the Arizona Supreme Court completely ignored in its decision facts

5   that showed how Hedlund's mitigation did in fact have a causal connection to his

6   crime, and how it showed another motive for his involvement in the crime: his

7   desire to protect his brother, the result of their incredibly abusive childhood, and

8   how this loyalty to his brother impaired his judgment. (Tr. 7/27/1993 at 9, 24, 34,

9   36; Tr. 7/28/1993 at 24; Tr. 7/26/1993 at 27.) The majority ignored how child abuse

10  has lifelong effects, and how here, it led to lasting neuropsychological impairments,

11  post-traumatic stress disorder, and alcoholism. *Hedlund*, 431 P.3d at 192 (Vasquez,

12  J., dissenting). (Tr. 7/27/1993 at 9–10, 15–17, 71, 78, 97.)

13         The Arizona Supreme Court made unreasonable factual determinations in its

14  findings regarding Hedlund's mitigation. *See* § 2254(d)(2). For instance, the

15  Arizona Supreme Court adopted the finding that the defense mental health expert

16  testimony at trial had little credibility, in part because the lay witness testimony did

17  not support a finding that Hedlund was an alcoholic. However, a fair reading of the

18  lay witness testimony and the entire record actually supports that conclusion.[28]

19

---

20  [28] Witnesses established that Hedlund drank daily, that he sometimes drank so much
    that he was physically and mentally impaired, he was a quiet and passive alcoholic,
21  and he drank on the night of the burglaries. Lemon and Morris testified that Hedlund
    was drinking beer when they drove around discussing the burglaries and when
22  Morris and McKinney burglarized homes. (Tr. 10/28/1992 at 50–51; Tr. 10/29/1992
23  at 112, 172.) Morris further testified that Hedlund fell asleep in the car on these
    occasions, which is consistent with testimony that Hedlund would drink until he fell
24  asleep. (Tr. 10/29/1992 at 130–31; Tr. 7/26/1993 at 16; Tr. 7/27/1993 at 51.)

25         Hedlund's half-sister testified that Hedlund would regularly drink a six-pack
    every night during the week, after work. (Tr. 7/27/1993 at 51.) On weekends,
26  Hedlund would drink a case, sometimes more, between Friday and Sunday. (Tr.
27  7/27/1993 at 51–52.) At times, Hedlund would drink so much that he had to be
    helped out of his car and carried up the stairs at home. (Tr. 7/27/1993 at 59.)
28  Hedlund would consume so much alcohol that he could not walk and was not aware

1       Further, other factors weigh strongly in favor of leniency: his limited
2 involvement in the crime, the fact that he was offered and accepted a plea bargain
3 to a term of years, which the judge rejected (Tr. 10/13/1992, evid. hr'g, at 4–7), and
4 then counsel missed a deadline to enter a second plea by four days (Tr. 10/13/1992,
5 evid. hr'g, at 17–18), and his exemplary behavior in the intervening decades. *See*
6 *Scott v. Schriro*, 567 F.3d 573, 584 (9th Cir. 2009) ("The plea offer's mitigatory
7 effect is clear: the prosecution thought this was not a clear-cut death penalty case."
8 (citation omitted)); *Busso-Estopellan v. Mroz*, 364 P.3d 472, 474 (Ariz. 2015)
9 (pretrial expression of willingness to plead guilty is relevant mitigation evidence
10 even where the offer is conditioned on a natural life sentence); *Skipper v. South
11 Carolina*, 476 U.S. 1, 4–5 (1986) (good behavior in prison is relevant mitigation).
12 The Arizona Supreme Court arbitrarily refused to give weight to this mitigation
13 evidence, despite state and federal case law to the contrary.

14       The Arizona Supreme Court's errors injected arbitrariness into Hedlund's
15 sentencing, and failed to adequately consider his personal history, in sentencing him
16 to death, in violation of federal law clearly established in *Penry*, 532 U.S. at 788,
17 *Gregg*, 428 U.S. at 188 and *Godfrey*, 446 U.S. at 432–33, among others.

18     **C.**   **Conclusion**

19       Given all of this, Hedlund is not among the "worst of the worst" people
20 convicted of first-degree murder who warrant the death penalty. If the death penalty
21 is not reserved for this narrow class of offenders, it is unconstitutional. To sentence
22 him to death nonetheless violates the Eighth and Fourteenth Amendments. The
23 Arizona Supreme Court's decision was an unreasonable determination of the facts,
24 based on the record before it, and was contrary to clearly established federal law.
25 *See* § 2254(d)(1),(2). Accordingly, Hedlund is entitled to relief.

26 ————————————

of his surroundings. (Tr. 7/27/1993 at 59.)

27      Hedlund's co-workers noticed that just before the murders, Hedlund was
28 drinking "very, very heavily," and they had been concerned about his drinking for
about six months previous. (Tr. 7/23/1993 at 31–32, 35–36.)

## CLAIM FIVE

**The Arizona Supreme Court unconstitutionally required that a death sentence was warranted unless Hedlund could prove his mitigating circumstances by a preponderance of the evidence, and could prove that they outweighed the aggravator.**

Hedlund's death sentence violates the Eighth and Fourteenth Amendments to the United States Constitution because the Arizona Supreme Court, in its decision, required a death sentence for Hedlund if he was not able to prove mitigating circumstances by a preponderance of the evidence, and that those circumstances outweighed the aggravator. *See State v. Hedlund*, 431 P.3d 181, 185 (Ariz. 2018). Hedlund hereby incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

The Arizona Supreme Court exhausted this claim in considering and ruling on its merits. The Arizona Supreme Court's decision was contrary to clearly established federal law, as discussed below. *See* § 2254(d)(2).

In the alternative, this claim was not raised in state court because it previously was not available or ripe for review, and there is an absence of state corrective process that would effectively protect Hedlund's rights. *See* 28 U.S.C. § 2254(b)(1)(B). Because this claim challenges adjudications by the highest court of Arizona, it is not possible to challenge these determinations in Arizona state courts, and any effort to do so would be futile. *See id*. Thus, there is no available forum to present this claim. Because this claim has not been adjudicated by Arizona state courts, and cannot be, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not restrict review, and the Court may consider the claim de novo.

In imposing Hedlund's death sentence, the Arizona Supreme Court framed its analysis as "whether the mitigation evidence individually or cumulatively is sufficiently substantial to call for leniency." *Hedlund*, 431 P.3d at 189. The court ordered the parties to brief "[w]hether the proffered mitigation is sufficiently substantial to warrant leniency in light of the existing aggravation." *Id*. at 184.

1   Further, the court held that "Hedlund has the burden of proving mitigation factors
2   by a preponderance of the evidence." *Id.* at 185 (citing *State v. Jones*, 937 P.2d 310,
3   322 (Ariz. 1997)).

### A.   The Arizona Supreme Court unconstitutionally required that Hedlund prove mitigation by a preponderance of the evidence.

6       By requiring Hedlund to prove mitigation by a preponderance of the
7   evidence, the Arizona Supreme Court failed to consider all of the relevant
8   mitigation presented, in violation of the Eighth and Fourteenth Amendments.

9       In *Lockett v. Ohio*, the Supreme Court concluded that, "in all but the rarest
10  kind of capital case," the sentencer must "not be precluded from considering, as a
11  mitigating factor, any aspect of a defendant's character or record and any of the
12  circumstances of the offense . . . [offered] as a basis for a sentence less than death."
13  438 U.S. 586, 604–05 (1978) (plurality opinion) (emphasis omitted). Moreover, "it
14  is not enough simply to allow the defendant to present mitigating evidence to the
15  sentencer. The sentencer must also be able to consider and give effect to that
16  evidence in imposing [the] sentence." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1998),
17  *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002); *see also*
18  *Tennard v. Dretke*, 542 U.S. 274, 285 (2004) ("[T]he 'Eighth Amendment requires
19  that the jury be able to consider and give effect to' a capital defendant's mitigating
20  evidence.") (quoting *Boyde v. California*, 494 U.S. 370, 377–78 (1990)). Imposing
21  a standard that limits the mitigating evidence considered violates the Eighth
22  Amendment's requirement that the sentencer be allowed to consider any aspect of
23  the defendant's character or record that counsels in favor of a sentence other than
24  death. *See, e.g.*, *Smith v. Texas*, 543 U.S. 37 (2004) (per curiam); *Tennard*, 542 U.S.
25  at 285; *Lockett*, 438 U.S. at 604; *Eddings v. Oklahoma*, 455 U.S. 104 (1982).

26      The decision to limit the mitigation the court could consider, and to give
27  mitigation evidence that did not meet the preponderance of the evidence standard
28  no weight, violated Hedlund's constitutional rights and prejudiced him.

**B.**    **The Arizona Supreme Court unconstitutionally required Hedlund to affirmatively prove that it should spare his life.**

The Arizona Supreme Court imposed Hedlund's death sentence under a framework with a presumption that death is the appropriate sentence, and forced Hedlund to affirmatively prove that it should spare his life, in violation of the Eighth and Fourteenth Amendments.

Arizona law required the Arizona Supreme Court to weigh the aggravation against the mitigation and determine whether the mitigation was "sufficiently substantial" before deciding whether to impose a death sentence. *See Richmond v. Lewis*, 506 U.S. 40, 47 (1992). In effect, then, Arizona law required the court to presume that death was the appropriate sentence for Hedlund and for him to prove that it was not.[29]

However, the Eighth Amendment demands a heightened degree of "reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion). That reliability is undermined when there is a presumption that death is appropriate. *See Walton v. Arizona*, 497 U.S. 639, 687–88 (1990) (Blackmun, J., dissenting) (recognizing that, with the statutory presumption of death, imposing a death sentence may "run[] directly counter to the Eighth Amendment requirement" of reliability), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In *Kansas v. Marsh*, 548 U.S. 163 (2006), the Supreme Court indirectly questioned the constitutionality of Arizona's death-penalty statute when it upheld the Kansas statute, which permitted a death sentence when the aggravating and mitigating circumstances were in equipoise. The Court noted that Arizona's statute is comparable to that of Kansas, except that in Arizona, "once the State has met its

---

[29] Arizona's capital statute also required a sentence of death when one aggravating circumstance is proven and no sufficiently substantial mitigation is proven, *see* A.R.S. § 13-703(E)(1991), further unconstitutionally entrenching the presumption in favor of death.

burden, tasks the defendant with the burden of proving sufficient mitigating circumstances to overcome the aggravating circumstances and that a sentence less than death is therefore warranted." *Id.* at 173. Unlike Arizona's statute, "the Kansas statute requires the State to bear the burden of proving to the jury, beyond a reasonable doubt, that aggravators are not outweighed by mitigators and that a sentence of death is therefore appropriate; it places no additional evidentiary burden on the capital defendant." *Id.* The Court noted that "[t]his distinction operates in favor of Kansas capital defendants," and in light of this distinction, the Court upheld Kansas's statute as constitutional. *Id.*

Without such safeguards, Arizona's capital-sentencing scheme cannot ensure the requisite reliability, and accordingly, it violated Hedlund's rights under the Eighth and Fourteenth Amendments. *See Woodson*, 428 U.S. at 305 (plurality opinion); *Patterson v. New York*, 432 U.S. 197, 210–11 (1977); *but see Walton*, 497 U.S. at 651–52.

### C.   Conclusion

Ultimately, the Arizona Supreme Court reviewed Hedlund's mitigation evidence and determined that "the evidence presented is not sufficient to warrant leniency in light of" the single aggravator. *Hedlund*, 431 P.3d at 190–91. Here, the Arizona Supreme Court unconstitutionally required that Hedlund prove his mitigation by a preponderance of the evidence. Further, it required that Hedlund prove that his mitigating evidence outweighed the aggravating evidence, thereby establishing a presumption of death, and putting the burden on Hedlund to prove otherwise. The court's capital-sentencing scheme essentially required that Hedlund be sentenced to death where there were one aggravator and no mitigators sufficient to warrant leniency. Accordingly, Hedlund's sentence is unconstitutional and cannot stand. He is entitled to relief.

## CLAIM SIX

**Executing Hedlund more than 26 years after he was sentenced to death violates the Eighth and Fourteenth Amendments.**

To subject Hedlund to execution after nearly 30 years of incarceration, either charged with a capital crime or on death row, violates the proscription on cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution. It is the Arizona Supreme Court's decision on independent review that Hedlund warranted the death penalty on December 10, 2018, after the Ninth Circuit conditionally granted the writ of habeas corpus, *see State v. Hedlund*, 431 P.3d 181 (Ariz. 2018), that constitutes the judgment that served to exhaust the Eighth and Fourteenth Amendments claim alleged here. Hedlund incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

The claim is reviewable in this Court in this second-in-time petition filed pursuant to 28 U.S.C. § 2254 under *Magwood v. Patterson*, 561 U.S. 320 (2010), because it has arisen in a new state court judgment intervening between habeas applications. In *Magwood*, the district court granted a conditional writ of habeas corpus under § 2254 and the petitioner was resentenced to death. In state post-conviction relief proceedings, Magwood raised for the first time a claim that he was not given "fair warning" that he was eligible for the death penalty because the state court interpretation of the Alabama capital sentencing statute was "unforeseeable." *Id.* at 327. The trial court denied relief on the basis that the statutory bases for the death penalty had been upheld on direct appeal from the initial death judgment, a judgment with which the appellate court agreed. *Id.* The state supreme court denied certiorari. *Id.*

Magwood raised the "fair warning" claim in a second-in-time § 2254 petition, which the district court addressed on the merits on the basis that habeas petitions that challenge the constitutionality of a resentencing are not successive to

petitions that challenge the underlying conviction and original capital sentence. The court granted relief on the "fair warning" claim, as well as a claim of ineffective assistance of counsel predicated on counsel's failure to bring the "fair warning" claim at trial. While the Eleventh Circuit reversed on the basis that the petition was second or successive under § 2244(b), the Supreme Court agreed with the district court. The Court ruled that the death sentence imposed in state court after the conditional grant of the writ in federal court was a new judgment and agreed with the petitioner that a "first application challenging a new judgment cannot be 'second or successive' such that § 2244(b) would apply." *Id.* at 331.

Similarly, the Arizona Supreme Court's imposition of a death sentence on de novo review of aggravation and mitigation in its independent review, *see McKinney*, 813 F.3d at 810, necessarily means that this claim has only become ripe after such review conducted after the Ninth Circuit's grant of the conditional writ. Should Hedlund's death sentence become final by virtue of the Supreme Court's denial of the petition for writ of certiorari in *Hedlund v. Arizona*, No. 19-5247, Hedlund will seek to stay the present proceeding under *Rhines v. Weber*, 544 U.S. 269 (2005), in order to exhaust this claim.

The Eighth and Fourteenth Amendments require that state-imposed punishment remain within civilized standards. *See Robinson v. California*, 370 U.S. 660, 675 (1962) (Douglas, J., concurring). Hedlund has been incarcerated for the crime at issue in his case for nearly 30 years, of which he has spent approximately 26 years on death row.[30] For several compelling reasons, executing Hedlund after so long on death row exceeds those civilized bounds.

First, executing Hedlund after so long spent on death row is inconsistent with the history of the Eighth Amendment and foundational British and American

---

[30] That Hedlund has been imprisoned for so long is not his own fault, but is attributable to constitutional errors in his trial and sentencing, and other delays outside of Hedlund's control.

jurisprudence. At the time the Bill of Rights was adopted, the Anglo-American legal tradition—which had a direct influence on the framers of the United States Constitution—had uniformly denounced undue delays between imposition of death sentences and executions as cruel and unusual. *See, e.g.*, Blackstone's Commentaries on the Laws of England, Book IV, reprinted in 2 Jones, Blackstone at 2650 (1976) ("[I]t has been well observed, that it is of great importance, that [capital] punishment should follow the crime as early as possible."); Beccaria, An Essay on Crimes and Punishments, ch. XIX at 73 (5th ed. 1804) (immediate punishment will be more just "because it spares the criminal the cruel and superfluous torment of uncertainty . . .; and because the privation of liberty, being [in and of itself] a punishment, ought to be inflicted before condemnation, but for as short a time as possible"); *see also, e.g.*, *Harmelin v. Michigan*, 501 U.S. 957, 966 (1991) (there is no doubt the English Declaration of Rights of 1689, which prohibited "cruel and unusual punishments," is the "antecedent of our constitutional text[s]"); *Ex parte Grossman*, 267 U.S. 87, 108–09 (1925) (Eighteenth-century English criminal jurisprudence directly relevant to determining what framers intended in drafting Bill of Rights). Historically, then, executing Hedlund after nearly 30 years charged with a capital crime or on death row would have been considered cruel and unusual.

Second, such a punishment is no less cruel and unusual under modern jurisprudence. The current death-penalty scheme is purported to serve two purposes: retribution and deterrence. *See Gregg v. Georgia*, 428 U.S. 153, 183 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.). But, the "longer the delay, the weaker the justification for imposing the death penalty in terms of punishment's basic retributive or deterrent purposes." *Knight v. Florida*, 528 U.S. 990 (1999) (mem.) (Breyer, J., dissenting from denial of certiorari); *see also Lackey v. Texas*, 514 U.S. 1045 (1995) (mem.) (Stevens, J., respecting denial of certiorari) ("It is arguable that neither [retribution nor deterrence] retains any force for

prisoners who have spent some 17 years under a sentence of death."). The lengthy delay between the day of incarceration and the day of execution "can inflict 'horrible feelings' and 'in (sic) immense mental anxiety amounting to a great increase of the offender's punishment.'" *Foster v. Florida*, 537 U.S. 990, 992 (2002) (mem.) (Breyer, J., dissenting from denial of certiorari).

After inflicting such anxiety on the petitioner by making him wait long periods before carrying out his death sentence, the State hardly furthers the goal of retribution by finally executing him. Further, the added deterrent effect of executing someone who has spent a long time on death row awaiting his execution is slight. *See Coleman v. Balkcom*, 451 U.S. 949, 952 (1981) (mem.) (Stevens, J., respecting denial of certiorari).

When the death penalty ceases to realistically further the purposes of retribution and deterrence, its imposition is simply "the pointless and needless extinction of life with only marginal contributions to any discernible social or public purposes." *Lackey*, 514 U.S. at 1046 (mem.) (Stevens, J., respecting denial of certiorari) (quoting *Furman v. Georgia*, 408 U.S. 238, 312 (1972) (White, J., concurring)). "A penalty with such negligible returns to the State would be patently excessive and cruel and unusual punishment violative of the Eighth Amendment." *Id.* Executing Hedlund almost three decades after the crime for which he was condemned has no deterrent or retributive purpose.

Third, the stress of living under threat of death for lengthy periods is so oppressive that it, on its own, can constitute cruel and inhuman treatment. Conditions of confinement on death row can be "so degrading and brutalizing to the human spirit as to constitute psychological torture." *People v. Anderson*, 493 P.2d 880, 894 (Cal. 1972), *superseded as stated in Strauss v. Horton*, 207 P.3d 48 (Cal. 2009); *see also Solesbee v. Balkcom*, 339 U.S. 9, 14 (1950) (Frankfurter, J., dissenting) ("[T]he onset of insanity while awaiting execution of a death sentence is not a rare phenomenon."); *In re Medley*, 134 U.S. 160, 172 (1890) ("[W]hen a

prisoner sentenced by a court to death is confined in the penitentiary awaiting the execution of the sentence, one of the most horrible feelings to which he can be subjected during that time is the uncertainty during the whole of it."). "Whatever one believes about the cruelty of the death penalty itself, this violence done [to] the prisoner's mind must afflict the conscience of enlightened government and give the civilized heart no rest." *Watson*, 411 N.E.2d at 1291 (Liacos, J., concurring). Certainly, then, such cruel treatment also renders any further punishment, namely execution, unconstitutional.

Finally, Hedlund spent nearly 20 years in solitary confinement, in the particularly oppressive conditions that prevailed on Arizona's death row, from 1997 to 2017. "[R]esearch still confirms what [the] Court suggested over a century ago: Years on end of near-total isolation exact a terrible price." *Davis v. Ayala*, 135 S. Ct. 2187, 2210 (2015) (Kennedy, J., concurring). Accordingly, the American Bar Association and the United Nations Special Rapporteur on Torture have recommended limitations on the use of solitary confinement. *See Glossip v. Gross*, 135 S. Ct. 2726, 2757 (2015) (Breyer, J., dissenting). Execution after prolonged solitary confinement is cruel and unusual.

Given the length of time Hedlund has spent on death row, the conditions of confinement, including the unique stress of living under threat of execution, historical understandings of "cruel and unusual" punishment, and the evolving standards of decency, executing Hedlund at this time would constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.

### CLAIM SEVEN

**Hedlund's death sentence must be vacated because of the cumulative prejudicial effect of all of the errors committed by the Arizona Supreme Court.**

The Arizona Supreme Court's various errors, considered cumulatively, violated Hedlund's rights under the Sixth, Eighth, and Fourteenth Amendments to the Unites States Constitution. Moreover, each of the court's errors deprived

Hedlund of his life and liberty interests in the Arizona Supreme Court's independent review that are protected by the Fourteenth Amendment. *See Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980). Hedlund's life interest under the Fourteenth Amendment's Due Process Clause is entitled to even greater protection than the liberty interests afforded in other contexts. When contrasting the protected life interest of a person on death row with the minimal due process rights afforded a defendant at a non-capital parole hearing, Justice Stevens stated:

> The interest in life that is at stake in this case warrants even greater protection than the interests in liberty at stake in those cases. For "death is a different kind of punishment from any other which may be imposed in this country. From the point of view of the defendant, it is different in both its severity and its finality. From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action. It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion.

*Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 293–95 (1998) (Stevens, J., dissenting in part) (quoting *Gardner v. Florida*, 430 U.S. 349, 357–58, (1977) (citations omitted) (plurality opinion)). Hedlund incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

As discussed in Claim 1, *supra*, the Arizona Supreme Court violated Hedlund's constitutional rights in granting the State's Motion for a New Independent Review (DA Docs. 15 and 23), instead of allowing his case to return to the trial court for a resentencing. The Arizona Supreme Court sentenced Hedlund to death after his sentence was effectively invalidated by the Ninth Circuit Court of Appeals when it found that his first sentencing proceeding violated the Constitution, as clearly established by *Eddings v. Oklahoma*, 455 U.S. 104 (1982). *Hedlund v. Ryan*, 854 F.3d 557, 563 (9th Cir. 2017). *See also Magwood v. Patterson*, 561 U.S. 320 (2010).

Hedlund could not have been executed if the Arizona Supreme Court had not made the decision to impose death. To the extent that the Arizona Supreme Court acted as an appellate court, it denied Hedlund's right to meaningful appellate review. To the extent the Arizona Supreme Court conducted an independent review, as it asserts, outside of direct review, this action was outside of Arizona's capital sentencing statute, *see* A.R.S. § 13-751 *et seq.*, and its normal procedures, and thus injected arbitrariness into Hedlund's sentencing.

Had the Arizona Supreme Court acted in a manner unmarred by constitutional error, it would not have re-imposed Hedlund's death sentence on independent review. The combination of errors in the Arizona Supreme Court's decision, discussed in the preceding claims, deprived Hedlund of his constitutional rights. Even if the errors are deemed harmless when viewed individually, their cumulative effect substantially prejudiced Hedlund and undermined the fairness and reliability of his proceedings.

Even in cases where no single error examined on its own is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant. *See, e.g.*, *Parle v. Runnels*, 505 F.3d 922, 934 (9th Cir. 2007) (affirming grant of habeas relief based on the cumulative prejudicial effect of multiple errors); *Alcala v. Woodford*, 334 F.3d 862, 894–95 (9th Cir. 2003) (same); *Duckett v. Mullin*, 306 F.3d 982, 992 (10th Cir. 2002) ("[T]he 'cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error.'" (quoting *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990))).

In this case, as a result of the cumulative effect of the errors by the Arizona Supreme Court, Hedlund's sentence was unlawfully and unconstitutionally imposed. The aggregate harm of these constitutional violations warrants granting this Petition without any determination of whether these violations substantially affected or influenced the sentence, as required for a grant of habeas relief under

the usual test of *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), because they were "especially egregious" and "so infect[ed] the integrity of the proceeding as to warrant the grant of habeas relief even if [they] did not substantially influence the [sentencer's] verdict." *See id.* at 638 n.9. Further, these constitutional violations so infected the integrity of the proceedings that the errors cannot be deemed harmless, and they did in fact have a substantial and injurious effect on the guilt and penalty judgments. *Id.* at 638. Considering all the errors above, this Court should conclude that Hedlund was denied the protections required for a death sentence to be constitutional, and grant him habeas relief.

### PRAYER FOR RELIEF

WHEREFORE, Hedlund respectfully prays this Court to do the following:

1.      Order that Hedlund be granted leave to conduct discovery pursuant to Rule 6 of the Rules Governing Section 2254 Cases and permit him to use the processes of discovery set forth in Federal Rules of Civil Procedure 26 through 37, to the extent necessary to fully develop and identify the facts supporting his Petition and any defenses thereto raised by Respondents' answer;

2.      Order that upon completion of discovery, Hedlund be granted leave to amend his Petition to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery, and that Hedlund be granted leave to expand the record pursuant to Rule 7 of the Rules Governing Section 2254 Cases to include additional materials related to the Petition;

3.      Grant an evidentiary hearing pursuant to Rule 8 of the Rules Governing Section 2254 Cases, at which proof may be offered concerning the allegations set forth in this Petition;

4.      Issue a writ of habeas corpus to have Hedlund brought before this Court, to the end that he may be discharged from his unconstitutional confinement and restraint;

5.      In the alternative to the relief requested in Paragraph 4, if this Court should deny the relief as requested in Paragraph 4, issue a writ of habeas corpus to have Hedlund brought before this Court to the end that he may be relieved of his unconstitutional sentences; and

6.      Grant such other relief as may be appropriate and dispose of the matter as law and justice require.

Respectfully submitted this 5th day of December, 2019

Jon M. Sands
Federal Public Defender
District of Arizona

Sara Chimene-Weiss
Timothy M. Gabrielsen

s/ Sara Chimene-Weiss
Counsel for Petitioner

1

**Certificate of Service**

2

I hereby certify that on December 5, 2019, I electronically filed the foregoing

3

Petition for Writ of Habeas Corpus with the Clerk's Office by using the CM/ECF

4

system. I certify that all participants in the case are registered CM/ECF users and

5

that service will be accomplished by the CM/ECF system.

6

7

I hereby certify that I also sent via electronic mail the forgoing document to:

8

Lacey Stover Gard, Chief Counsel
Assistant Attorney General

9

Capital Litigation Section

10

Arizona Office of the Attorney General
Lacey.Gard@AZAG.gov

11

CADocket@AZAG.gov

12

13

s/ Jessica Ward

14

Assistant Paralegal
Capital Habeas Unit

15

16

17

18

19

20

21

22

23

24

25

26

27

28